CARTER/MONDALE PRESIDENTIAL
COMMITTEE, INC., Petitioner,

v.

FEDERAL ELECTION COMMISSION,
Respondent.

No. 82–1754.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 17, 1983.

Decided June 24, 1983.

Douglas B. Huron, Washington, D.C., for petitioner. Eileen M. Stein, Washington, D.C., also entered an appearance for petitioner.

Richard B. Bader, Asst. Gen. Counsel, Federal Election Com'n, Washington, D.C., with whom Charles N. Steele, Gen. Counsel, Miriam Aguiar and Anne A. Weissenborn, Attys., Federal Election Com'n, Washington, D.C., were on the brief for respondent. Kim L. Bright, Atty., Federal Election Com'n, Washington, D.C., also entered an appearance for respondent.

Before WALD and MIKVA, Circuit Judges, and SWYGERT,* Senior Circuit Judge for the Seventh Circuit.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The Carter-Mondale Presidential Committee, Inc. ("the Committee") appeals a final determination by the Federal Election Commission ("FEC") that the Committee must repay $104,300.78 to the United States Treasury to cover primary campaign ex-

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

penses that do not qualify under the Presidential Primary Matching Payment Account Act ("the Act"), 26 U.S.C. §§ 9031–9042. We find that we do not have jurisdiction to review the FEC's final repayment determination because the Committee failed to file its petition for review "within 30 days after the agency action by the [FEC] for which review is sought." *Id.* § 9041(a). Therefore, we do not reach the issue of statutory interpretation raised by the Committee: whether the FEC properly interpreted *id.* § 9038(b)(2) to require the Committee to repay federal matching funds in an amount equal to the total of all funds, federal plus nonfederal, spent for nonqualified expenses, or whether the Committee need return only the proportion of nonqualified expenses that were paid for with federal funds.[1]

## I. BACKGROUND

It should not normally be difficult to decide whether a litigant has filed its petition for review within the 30-day jurisdictional time limit of 26 U.S.C. § 9041(a). Unfortunately, in this case the FEC's communications with the Committee failed to identify explicitly the point at which the time to appeal from the final decision began to run. Considerable confusion could be avoided in the future if the FEC would follow common agency practice and inform affected parties—by regulation or in the letter communicating its final determination—when the 30-day period for a petition for review begins to run. Because the FEC gave no such notice here, we find it necessary to outline the administrative proceedings in some detail to explain why we conclude that the Committee petitioned too late.

The sequence of events began on November 20, 1979, when the FEC decided that President Carter was eligible to receive matching federal payments for his campaign for the Democratic Party's 1980 presidential nomination.[2] Subsequently, his Committee received $5,117,854.00 in federal funds for the primary campaign. After President Carter received the Democratic Party's nomination, the FEC commenced its audit of the Committee as required by *id.* § 9038(a).

On November 7, 1980, the FEC's Audit Division sent the Committee an *interim* audit report and notified the Committee that it had 30 days in which to respond. The Committee submitted a response to the interim audit report on December 1, 1980, *see* Supplemental Appendix ("S.A.") at 1–7, and provided additional information on December 10. *See* S.A. at 8–21. In these letters, the Committee took issue with the Audit Division's allocation of expenses against state spending limits, which resulted in the Division's calculation that some expenditures were not "qualified campaign expenses" because they were over state limits. The Committee did not, however, contest the issue of the percentage of nonqualified expenses that it must repay even though the interim audit recommended that the amount of nonqualified expenses be "repaid in full," *see* Interim Report at 14,

---

1. The Committee proposes that the FEC calculate the amount of federal funds spent on nonqualified expenses by computing the ratio of federal matching funds to total campaign funds and then applying that ratio to the amount of nonqualified expenses. (*E.g.*, if 25% of a committee's funds were from federal matching payments and the committee had $2000 of nonqualified campaign expenses, then the committee would repay $500 to the government.) This is the repayment approach Congress designed for a committee that has a surplus. 26 U.S.C. § 9038(b)(3).

2. The Presidential Primary Matching Payment Account Act ("the Act"), enacted in 1974, provides matching funds for some contributions to presidential primary election campaigns. Candidates who meet the eligibility requirements of 26 U.S.C. § 9033 are entitled to matching funds to help pay for "qualified campaign expenses," *see id.* § 9032(9). Under *id.* § 9035, campaign expenditures are not "qualified" if they exceed certain spending limits, which include both an overall campaign spending ceiling as well as limits on campaign expenditures in each state. Campaign expenditures over these limits create a repayment obligation under *id.* § 9038(b)(2). Most of the disagreements between the FEC and the Committee during the audit and repayment calculation process involved the assignment of expenses against state limits.

record item 1; the Committee only noted that the interim audit report recommendations, if adopted, "would represent in effect a 100% penalty for alleged overspending" on the order of $150,000.00, see S.A. at 20.

On January 19, 1981, the FEC sent the Committee the "Report of the Audit Division." The FEC's cover letter noted that the FEC had approved the audit report and had made a determination, pursuant to 26 U.S.C. § 9038(b), that the Committee had to repay $129,443.70 within 90 days. See Joint Appendix ("J.A.") at 4. The letter further explained that under 11 C.F.R. § 9038.2(b) (1981) the Committee had 30 days to submit legal or factual materials in opposition to the FEC's repayment determination, and that the FEC would consider such materials in making a *"final determination,"* the term used in *id.* § 9038.2 to describe the last step in the FEC's repayment evaluation process. See J.A. at 4 (emphasis added).

On February 18, 1981, the Committee sent the FEC a "request for reconsideration" of the repayment determination. The Committee's submission included a detailed section-by-section analysis that contested a number of findings in the FEC Audit Report. See J.A. at 23–36. The Committee also requested an extension of time in which to submit more materials[3] and "reiterate[d] its request for a hearing."[4] See

J.A. at 34. Again, the Committee did not take issue with the FEC's statement that the Committee would have to repay the full amount of nonqualified campaign expenses.

On June 9, 1981, the FEC voted unanimously to deny the Committee's requests "for an oral hearing on the issue of repayment of matching funds" and for an extension of time to supplement its response to the "Final Audit Report." J.A. at 37. An FEC letter of June 12 communicated these denials to the Committee and explained that the Committee's challenge to the repayment determination brought into play 11 C.F.R. § 9038.2(e), which gave a protesting candidate 20 days to repay after receipt of the FEC's "final repayment determination," with the possibility of a 90-day extension upon application. See J.A. at 38–39.

On July 7, 1981, the FEC sent the Committee its *"final determination* that the Committee's repayment obligation [for exceeding state limits], pursuant to 11 C.F.R. § 9038.2(c), totals $117,826.15." J.A. at 40 (emphasis added). The FEC also included a statement of reasons as required by *id.* § 9038.2(d). The FEC had revised its previous calculation of the amount owed slightly downward because it had accepted two of the Committee's arguments about not applying certain expenses against state ex-

---

**3.** The Committee sought an extension of time in which to reply to the FEC's final audit report (which formed the basis for the initial repayment determination) because it wanted to comment further after examining the FEC General Counsel's memorandum on the audit report. After being denied access to the General Counsel's paper, the Committee had filed a Freedom of Information Act request for it on February 13, 1981. See J.A. at 24, 34.

**4.** It is not clear from the record when the Committee first requested an oral hearing. In the Committee's February 18, 1981 response, it complained that the FEC's regulations used to contain a provision for a hearing on the repayment determination and asserted that such a hearing was justified now even though the "new" regulations no longer contained an "explicit hearing right." See J.A. at 34–35 (citing 11 C.F.R. § 134.2(b) (1979), *superseded on* May 7, 1979).

On April 30, 1981, counsel for the various presidential candidate committees sent a joint letter to the FEC urging it to change a number

of its policies, including its denial of opportunity for oral hearings. See J.A. at 74–80. The FEC treated this joint letter as a general comment on its procedures, not as a filing in any one case, and sent a general response on May 14. See J.A. at 71–73.

As noted in the text, the FEC notified the Committee by letter of June 12, 1981, that it had denied the Committee's request for an oral hearing. This notice was sent almost a month before the FEC's "final determination" of the Committee's repayment obligation. Thus, there was no reason for the Committee to believe it need not file a petition for review of the "final determination" because of the possibility of a future oral hearing. The FEC's decision two years later to provide an opportunity for an oral presentation in its regulations does not excuse the Committee's delay here. See 48 Fed.Reg. 5224, 5249, 14347, 16237 (1983) (effective Apr. 4, 1983) (to be codified at 11 C.F.R. § 9038.2(c)(3)).

penditure limits. In addition, the FEC explained that the Committee could further reduce this sum by documenting the amount paid for long distance telephone calls made from Iowa, New Hampshire, and Maine to national headquarters. Finally, the FEC reminded the Committee that according to *id.* § 9038.2(e), the Committee must repay the $117,826.15, subject to the documented phone call adjustment, within 20 days, although it could seek a 90-day extension of the repayment period. *See* J.A. at 40, 49.

On July 29, 1981, the Committee requested the 90-day extension for repayment as well as an extension of time to produce its long distance telephone records. *See* J.A. at 50. In a letter dated August 18, the FEC granted both requests. It gave the Committee until August 27 to produce the telephone records, after which "[a] *final calculation* of the Committee's repayment obligation will be made," J.A. at 51 (emphasis added). Repayment of that obligation would be "due no later than November 6, 1981." *Id.*

In a letter dated August 19, and therefore probably sent before the Committee received the FEC's letter granting the two requests for extensions, the Committee outlined its own view of the repayment timetable. First, the Committee pointed out that although the FEC's July 7, 1981 letter claimed to be a "final determination" pursuant to 11 C.F.R. § 9038.2(c), it could not be final until the interstate telephone expense data, which had been sent recently to the FEC, were "confirmed and subtracted from the interim repayment total . . . of July 7th." J.A. at 52. Second, the Committee asserted that the 90-day repayment period should begin only after "all pending matters in connection with the underlying Report are resolved." J.A. at 53. The Committee explained that pending matters included not only the deduction of the long distance telephone charges, but also the Committee's appeal of its FOIA request for the FEC General Counsel's report on audit issues. Third, the Committee stated that it intended to make another filing with the FEC for reconsideration of the "proposed

audit findings," including "the Committee's purported repayment liability." *Id.*

There is no evidence in the record that the FEC replied to the Committee's declaration of procedural independence. However, on October 27, 1981, the FEC notified the Committee that its long distance telephone documentation had been accepted and that the total repayment amount due was $104,300.78—the amount that the Committee now challenges. *See* J.A. at 55–56.

On December 10, 1981, the Committee sent a letter to the FEC concerning repayment terms. The letter noted that the Committee had already tendered $75,000.00 to the FEC, but that it "seriously dispute[d]" any additional amount. Then, and for the first time in any materials in the record, the Committee made the core assertion of this appeal:

> [E]ven if it is assumed that a certain amount . . . was improperly spent, we believe that the proper repayment obligation should reflect only that portion of the amount in question which is attributable to Federal matching funds. See 26 U.S.C. 9038(b)(2).

J.A. at 60. The next paragraph of the letter "offers" the FEC the Committee's repayment plan:

> [W]e are prepared to tender to the [FEC] the balance in dispute . . ., provided that the [FEC] agrees that we retain the right to continue to contest issues arising out of the audit determination, and provided further that the [FEC] agrees to certify for payment to our Committee any amounts which are finally determined not to have been owed by us in connection with the audit.

*Id.*

On February 4, 1982, the FEC provided an ambiguous reply. The FEC "agree[d] that repayment by the Committee of the full amount determined by the [FEC] to be repayable will not substantively moot any disputed issues involved in the [FEC's] repayment determination." J.A. at 61. But the FEC stated that it did "not waive any substantive or procedural rights with re-

gard to any action which may be taken later by the Committee concerning repayment." *Id.* Finally, however, the FEC stated that it "also agrees that pending final *administrative* or judicial resolution of the issues in dispute the Committee may make repayment with the understanding that any amount of that repayment later deemed in excess of the requirements of Section 9038(b) will be paid to the Committee." *Id.* (emphasis added).

On February 25, the Committee tendered $15,000.00 to the FEC (raising the total paid to $90,000.00). It wrote that "in accordance with the agreement embodied in our exchange of correspondence," repayment would "not substantively moot any disputed issues," and that the Committee could repay " 'pending final administrative or judicial resolution of the issues in dispute' " without waiving a right to a refund of excess payments. *See* J.A. at 62.

The next communication from the FEC to the Committee in the record is dated June 10, 1982. It recounts that in January 1982, the Committee "presented to the [FEC] ... a package of twelve letters and report amendments which, according to the [FEC's] Audit Division, represented a proposal by the [Committee] to reduce its outstanding [repayment] obligations." J.A. at 65.[5] The FEC letter then explains that this submission was "out of time," and that FEC regulations do not provide for accepting "additional documentation after a final repayment determination." *Id.* at 66. In the course of this explanation, the FEC notes the procedural framework for agency review that was noticeably absent from its

February 4 letter. It reminds that: the FEC made its "final determination" on repayment in July 1981; the notification was accompanied by the required written statement of reasons; the Committee sought and received a 90-day extension for repayment, making it due by November 6, 1981; and the Committee received notification on November 2, 1981 [presumably the Oct. 27, 1981 letter], that the repayment amount had been reduced because the Committee had documented specific telephone charges as identified in the FEC's final determination. *See id.* at 65–66. In closing, the FEC added that it had not altered its previous decision to deny the Committee an oral hearing. *See id.* at 66.

On June 22, the Committee wrote the FEC that it understood that "all agency action with respect to the [FEC's] audit ... is now complete," and asked to be informed if this assumption was incorrect. J.A. at 67. On July 6, 1982, the Committee filed this petition for review of the FEC's action.

## II. ANALYSIS

The first issue is whether we have jurisdiction. According to 26 U.S.C. § 9041(a),[6] a party must file a petition for review in this court "within 30 days after the agency action by the [FEC] for which review is sought." This statutory time limit is "jurisdictional and unalterable." *Cities of Batavia, Naperville v. FERC,* 672 F.2d 64, 72–73 (D.C.Cir.1982) (footnote omitted) (60-day time limit to petition for review of an order under the Federal Power Act, 16 U.S.C. § 825*l*(b), is jurisdictional). *See also* Fed.

---

5. The Committee apparently proposed to convert payments it owed former Committee personnel into in-kind contributions or exempt travel expenses. It then hoped to convince the FEC that these amounts should be subtracted from the expenditure totals for Iowa, Maine, and New Hampshire because the amounts would no longer represent payments by the Committee. By reducing the totals spent in these three states, the Committee thought it could decrease the sum it spent over state expenditure limits by about $2,600 and thereby reduce its repayment obligation. *See* J.A. at 65.

6. 26 U.S.C. § 9041 states:

(a) Review of agency action by the Commission.—Any agency action by the Commission made under the provisions of this chapter shall be subject to review by the United States Court of Appeals for the District of Columbia Circuit upon petition filed in such court within 30 days after the agency action by the Commission for which review is sought.

(b) Review procedures.—The provisions of chapter 7 of title 5, United States Code, apply to judicial review of any agency action, as defined in section 551(13) of title 5, United States Code, by the Commission.

R.App.P. 26(b) (a court may not enlarge the time prescribed by law for filing a petition from an order of an agency except as specifically authorized by law); *Pennsylvania v. ICC,* 590 F.2d 1187, 1192–93 (D.C.Cir. 1978) (60-day time limit to petition for review of a final order under the Hobbs Act, 28 U.S.C. § 2344, is jurisdictional).[7]

To determine which FEC actions may be "subject to review" (and thus trigger the jurisdictional time limit), we look to 26 U.S.C. § 9041(b). First, that subsection incorporates the definition of "agency action" in 5 U.S.C. § 551(13), to "include[ ] the

7. The "Committee does not dispute that the 30-day filing period set forth in [§] 9041 is jurisdictional in nature." Committee's Reply Brief at 10. However, because we have an independent responsibility to examine jurisdictional issues, we also note why we believe the time limit in this case is distinguishable from a nonjurisdictional filing requirement like the one involved in 42 U.S.C. § 2000e–5(e). *See Zipes v. Trans World Airlines,* 455 U.S. 385, 392–98, 102 S.Ct. 1127, 1132–35, 71 L.Ed.2d 234 (1982). In determining whether the filing requirement in *Zipes* was jurisdictional, the Court analyzed "[t]he structure of Title VII [of the Civil Rights Act of 1964], the congressional policy underlying it, and the reasoning of our cases." *Id.* at 393, 102 S.Ct. at 1132. The statutory structure is the key element here because we do not have any useful legislative history or case law with which to supplement it. Section 9041 includes both the grant of jurisdiction to this court and the time period for *filing in this court;* in contrast, *Zipes* points out that Title VII contains separate provisions that grant jurisdiction in the district courts and that specify the time for *filing charges with the EEOC.* 455 U.S. at 393–94, 102 S.Ct. at 1132–33. As this difference in statutory structure suggests, the statutes reflect different congressional policies. Title VII integrates the efforts of laymen who may be victims of discrimination, the EEOC, and the courts. The laymen initiate the process and the EEOC is available in part to provide support for meritorious claims. In contrast, § 9041, like the other jurisdictional time limits cited in text, prescribes *judicial* review procedures that *follow* a detailed administrative review process between *two* legally sophisticated parties (a campaign committee and the FEC).

8. The term *order* is further defined as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6).

whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or a failure to act." Certainly the FEC action challenged by the Committee—the calculation of the Committee's repayment obligation—qualifies under that definition.[8] Second, § 9041(b) also instructs that 5 U.S.C. §§ 701–706 establish the procedures for judicial review of FEC "agency action." Under that chapter, judicial review is limited to "final agency action" unless the preliminary action has been made "directly reviewable." 5 U.S.C. § 704;[9] *see FTC v. Standard Oil Co.,* 449

The Supreme Court's notation in *FTC v. Standard Oil Co.,* 449 U.S. 232, 238 n. 7, 101 S.Ct. 488, 492 n. 7, 66 L.Ed.2d 416 (1980), on the legislative history of the term "agency action," underscores our conclusion that the FEC's final repayment determination qualifies: "The term 'agency action' brings together previously defined terms in order to simplify the language of the judicial-review provisions . . . and to assure the complete coverage of every form of agency power, proceeding, action, or inaction. In that respect the term includes the supporting procedures, findings, conclusions, or statements or reasons or basis for the action or inaction." *Id.* (quoting S.Doc. No. 248, 79th Cong., 2d Sess. 255 (1946)).

9. 5 U.S.C. § 704 makes judicial review available for two categories of agency action: "[a]gency action made reviewable by statute" and "final agency action for which there is no other adequate remedy in a court." While only the second category contains a reference to finality, we conclude, as explained below, that Congress also assumed that "[a]gency action made reviewable by statute" would be final action.

The legislative history of § 704 reveals that Congress intended to codify existing law on judicial review of agency actions. *See, e.g.,* Senate Judiciary Comm., *Committee Print on the Administrative Procedure Act* 27 (1945) ("1945 Sen. Print"), *reprinted in* Senate Judiciary Comm., 79th Cong., 2d Sess., *Administrative Procedure Act: Legislative History* 11, 37 (Comm. Print 1946) ("*APA Leg.Hist.*"); S.Rep. No. 752, 79th Cong., 1st Sess. 43 (1945) (Appendix B, Attorney General's Statement), *APA Leg.Hist.* at 185, 230; *Attorney General's Manual on the Administrative Procedure Act* 101 (1947) (Since the Department of Justice played a significant role in drafting the APA, its contemporaneous interpretation deserves "some deference," *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 546, 98 S.Ct. 1197, 1213, 55 L.Ed.2d 460 (1978).). The exist-

U.S. 232, 238, 101 S.Ct. 488, 492, 66 L.Ed.2d 416 (1980). Therefore, the crucial question in this case is: *When* did this agency action become *final* so as to trigger the 30-day period in which the Committee had to petition for review?

The FEC contends that its July 7, 1981 letter—which informed the Committee of the FEC's "final determination" of the Committee's repayment obligation, subject only to subtractions for certain documented phone calls—was final agency action for purposes of judicial review. The FEC argues that the finality of its July action was not undermined by the Committee's opportunity to reduce minimally the amount owed through "mechanical[ly]" documenting some phone calls. Government's Brief at 13 n. 14. The FEC also points out that even this adjustment was completed in Oc-

tober 1981.[10] The Committee responds that the repayment determination was not final for purposes of judicial review until June 10, 1982—the date of the FEC letter that rejected additional documents from the Committee and denied again the Committee's request for an oral hearing.

The Supreme Court recently discussed "final agency action" in some detail in *FTC v. Standard Oil Co.*, 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980) (relying heavily on *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). First, the Court in *Standard Oil* noted that " '[t]he cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way' " and taken a " 'flexible view' " of the matter. 449 U.S. at 239–40, 101 S.Ct. at 493 (quoting 387 U.S. at 149–50, 87 S.Ct. at 1515–16).[11]

ing law at that time included a court-imposed finality requirement as a prerequisite for judicial review. *See* Final Report of the Attorney General's Committee on Administrative Procedure, *Administrative Procedure in Government Agencies*, S.Doc. No. 8, 77th Cong., 1st Sess. 85 (1941) ("Legislation which limits judicial review to 'final' orders merely enacts the self-imposed policy of the courts."); *Attorney General's Manual on the Administrative Procedure Act* 101, 102 (1947) ("Moreover, many regulatory statutes, either expressly *or as they are interpreted,* have provided for review of (and only of) 'final' agency orders, with the result that the judicial construction of such provisions will carry over . . . .") (emphasis added) (citation omitted).

We recognize that the finality mandate in § 704 is tempered with a caveat that Congress may decide to make a "preliminary, procedural, or intermediate agency action" "directly reviewable." We conclude, however, that Congress did not craft 26 U.S.C. § 9041 to fit that exception. The statutory language merely states that judicial review is available; it does not delineate a set of "directly reviewable" actions or include any language that might raise doubts about maintaining the finality requirement. Nothing in the legislative history of the APA suggests that a statute that simply states, as does § 9041(a), that any agency action is reviewable, has displaced the finality test. On the contrary, the Senate Judiciary Committee explained that one purpose of § 704 was "to negative any intention to make reviewable merely preliminary or procedural orders where there is a subsequent and adequate remedy at law available, as is presently the rule." 1945 Sen. Print 27, *APA Leg.Hist.* 37 (citations omitted). Moreover, the incorporation of the judi-

cial review procedures of chapter 7 of title 5 through 26 U.S.C. § 9041(b) raises the inference that Congress expected the finality limitation of 5 U.S.C. § 704 to apply. Finally, we note that even if § 9041(b) did not refer to the judicial review procedures of the APA, courts commonly impose a finality requirement where statutes simply provide for judicial review of agency actions. *See, e.g., Association of National Advertisers, Inc. v. FTC,* 627 F.2d 1151, 1178 (D.C.Cir.1979) (Leventhal, J., concurring), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980); *Rombough v. FAA,* 594 F.2d 893, 895 n. 4 (2d Cir.1979); *Greene County Planning Bd. v. FPC,* 455 F.2d 412, 425–26 (2d Cir.), *cert. denied,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972).

**10.** The FEC adjusted the amount the Committee was to repay on October 22, 1981, and notified the Committee of the reduction on October 27.

**11.** In *Abbott Laboratories,* the Court found that "the publication of certain regulations by the Commissioner of Food and Drugs was . . . final agency action subject to judicial review in an action for declaratory judgment brought prior to any Government action for enforcement." *FTC v. Standard Oil Co.,* 449 U.S. at 239, 101 S.Ct. at 493. *Abbott Laboratories* relied in turn on *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956) (FCC regulation stating that an applicant already owning five television licenses could not acquire another was final action; a specific license application need not be before the FCC); *Frozen Food Express v. United States,* 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910

The Court then noted the indicia of finality on which it had relied in *Abbott Laboratories:* the administrative action challenged should be a " 'definitive' statement[ ]" of an agency's position; the action should have a " 'direct and immediate ... effect on the day-to-day business' of the complaining parties"; the action should have " 'the status of law' "; " 'immediate compliance with the[ ] terms [should be] expected' "; and the question should be a legal one " 'fit for judicial resolution.' " 449 U.S. at 239–40, 101 S.Ct. at 493 (quoting 387 U.S. at 151–54, 87 S.Ct. at 1516–19).[12]

Although less detailed than *Standard Oil,* the Supreme Court's explanation of the finality doctrine in *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970), is significant because, like the case before us, it involved the application of a jurisdictional time limit for petitions for review. In *Rederiaktiebolaget Transatlantic,* a shipper attempted to attack collaterally a Federal Maritime Commission ("FMC") order that it had not appealed; one of the shipper's arguments was that the FMC order was not final because "it had no independent effect on anyone." *Id.* at 70–71, 91 S.Ct. at 209–10. The Court, however, found that the FMC's order was indeed final, and that the shipper had missed its opportunity to seek review in the court of appeals within the statutory 60-day time limit. *Id.* at 71–72, 91 S.Ct. at 209–10. It explained that:

> [T]he relevant considerations in determining finality are whether the process of administrative decision-making has reached a stage where judicial review will not disrupt the orderly process of adjudication and *whether rights or obligations have been determined* or legal consequences will flow from the agency action.

*Id.* at 71, 91 S.Ct. at 209. (emphasis added) (citations omitted).[13]

If we are to interpret finality in a "pragmatic" fashion, however, we need to consider whether finality should be analyzed differently when the determination forecloses review altogether rather than merely delays the appeal. In most finality cases the question is whether a party can appeal an agency action now or must wait until some subsequent agency action occurs. Thus, in *Abbott Laboratories,* the Court introduced its analysis of ripeness—of which its discussion of finality was a part—by explaining that it had "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of *withholding* court consideration." 387 U.S. at 149, 87 S.Ct. at 1515 (emphasis added). Here, on the other hand, we must balance the FEC's interest in prompt review of a final repayment obligation against the hardship to the Committee from foreclosing its right to judicial review of that final obligation. The Committee claims that it was only trying to

---

(1956) (ICC order that specified commodities not within a statutory exemption was final action; carrier of nonexempt commodities who believed they should be exempt need not wait until the ICC took action against him); *Columbia Broadcasting Sys. v. United States,* 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942) (FCC regulation asserting that the agency would not license stations that maintained certain contracts was final action although no license had been denied or revoked).

**12.** After applying these indicia, the Court in *Standard Oil* concluded that the FTC's "issuance of a complaint averring reason to believe that [Standard Oil] has violated the [FTC] Act" was *not* "final agency action." 449 U.S. at 243–46, 101 S.Ct. at 494–96. Rather, the Court explained, the FTC's action was only a "threshold determination that further inquiry is

warranted and that a complaint should initiate proceedings." *Id.* at 241, 101 S.Ct. at 493.

**13.** The Court's consideration of whether an "obligation [has] been determined," certainly an important test for finality in this case, appears to be of long standing. *See Chicago & S. Air Lines v. Waterman S.S. Corp.,* 333 U.S. 103, 112–13, 68 S.Ct. 431, 436–37, 92 L.Ed. 568 (1948) ("[A]dministrative orders are not reviewable unless and until they impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process.") (citations omitted). *Accord Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Comm'n,* 680 F.2d 810, 815 (D.C.Cir.1982); *Fidelity Television, Inc. v. FCC,* 502 F.2d 443, 448 (D.C.Cir.1974) (per curiam); *Air Calif. v. United States Dep't of Transp.,* 654 F.2d 616, 619–22 (9th Cir.1981).

exhaust the administrative process, to avoid rushing to court, and that by cutting off its right to review altogether we ill-serve the interests underlying the finality doctrine because we create an incentive to petition prematurely.

Yet, so far as we can tell, the different consequences of finality determinations in these two situations have not led courts to devise different criteria for assessing when agency action is final. *Cf. Rederiaktiebolaget Transatlantic*, 400 U.S. at 70–72, 91 S.Ct. at 209–10. This seems reasonable: Insofar as a finality determination establishes a point on the time line of an administrative process, that point should signal if an appeal is too late as well as if one is too early. It is logical that when Congress created time limits in which to appeal, such as the 30-day period here, it wanted the time to run from the first day a party is presumed to know it may file a petition for review. If we instead found that there was some interlude between the earliest date a petition may be filed and the date from which to start counting the 30-day period, we would undermine the very purpose of Congress' statutory time limit. Moreover, the criteria for evaluating the finality of agency action should be suitable for providing notice both to parties who are eager and waiting to appeal, and to parties who want to continue discussions with an agency up to the last minute.

We now apply the Court's guidance on finality to the FEC's calculation of the Committee's repayment obligation. We conclude, as explained below, that the repayment obligation became final for purposes of judicial review no later than October 27, 1981. Indeed, the FEC has a cogent argument that its repayment determination of July 7, 1981, started the 30-day period running, even though the final dollar figure was dependent on the documentation and subtraction of certain telephone calls.[14] We need not select between July 7 and October 27 (when the adjustment for phone calls was completed), however, because the date the Committee eventually filed its petition (July 6, 1982) was long past the 30-day period triggered by either time.

Our evaluation of when the repayment determination became final is based on an examination of how the audit process was performed and whether it produced a result that satisfies the Court's tests for finality. We believe that the FEC regulations outline a clear process for determining a definitive repayment obligation that has the status of law, and that the FEC took pains to explain each step as it moved toward final administrative resolution of the issues on which the Committee might seek judicial review.[15]

---

**14.** *Compare American Dairy of Evansville, Inc. v. Bergland*, 627 F.2d 1252, 1260–61 (D.C.Cir. 1980) (Administrative Law Judge's order denying requests for advance notice and termination of a retroactive notice provision was final even though he retained jurisdiction to allow the Secretary of Agriculture to take "corrective action" if desired) *and Hattersley v. Bollt*, 512 F.2d 209, 213–15 (3d Cir.1975) (district court's judgment that a party is a joint tortfeasor and liable in contribution to another is a final, appealable order even though the judgment does not assess the precise monetary amount owed; the judgment establishes parameters of liability and only a later ministerial act is required to implement the judgment) *with Sun Shipbuilding & Dry Dock Co. v. Benefits Review Bd.*, 535 F.2d 758, 760–61 (3d Cir.1976) (per curiam) ("well-established rule [for appeals from district courts] ... that where liability has been decided but the extent of damage remains undetermined, there is no final order" applies to administrative proceedings where the board remanded for nonministerial redetermination of amount of workers' hearing loss and amount of damages) (footnote omitted) *and Wrist-Rocket Mfg. Co. v. Saunders Archery Co.*, 516 F.2d 846, 848–49 (8th Cir.) (court lacked jurisdiction to review the district court's determination of liability until the district court determined amount of damages), *cert. denied*, 423 U.S. 870, 96 S.Ct. 134, 46 L.Ed.2d 100 (1975).

**15.** We do not suggest that an agency's *exhaustion* of its administrative review process necessarily produces a *final* agency action fit for judicial review. *See FTC v. Standard Oil Co.*, 449 U.S. at 243–45, 101 S.Ct. at 494–95 (exhaustion should not be mistaken for finality; an agency's refusal to reconsider action does not render it "definitive"). Rather, we emphasize the FEC's administrative process because it is clearly designed to produce a definitive obligation in accordance with 26 U.S.C. § 9038. The FEC's regulations, as well as the FEC's continual references to them throughout its repayment review, gave the Committee ample

Under the regulations in effect at the time, *see* 11 C.F.R. § 9038.1 (1982), the administrative review process began with an audit of a committee's campaign expenses. The FEC divided the audit process into interim and final audit reports to give committees an opportunity to respond before any repayment determination was made and released to the public.[16] The FEC sent the Committee the interim report on November 7, 1980, and the Committee submitted responses on December 1 and 10.

The next step was the FEC's release of its formal "Report of the Audit Division" on January 19, 1981. At that time the FEC explained to the Committee where it stood in the regulatory process: The FEC's audit had resulted in a *repayment determination* under 26 U.S.C. § 9038(b) and 11 C.F.R. § 9038.2, but under *id.* § 9038.2(b) the Committee had 30 more days for another reply before the FEC would make a *final determination*. Again, the Committee responded with detailed comments. The Committee also wanted more time and an oral hearing, which had once been but was no longer available under FEC regulations. When the FEC communicated its denial of these requests on June 12, 1981, it again delineated the Committee's progress through the process: Under *id.* § 9038.2(e) the Committee would have 20 days to pay (with a possible 90-day extension) after the FEC's "final determination."

About a month later (July 7) and eight months after the FEC gave the Committee its interim audit report, the FEC made its *final repayment determination.* An agency's characterization of finality is not necessarily decisive.[17] But in this case the characterization fits neatly a pattern of agency action indicating the FEC had completed its process and imposed a formal repayment obligation on the Committee. The FEC's July 7 letter pointed out that the determination was pursuant to *id.* § 9038.-2(c), included the FEC's reasons as required by *id.* § 9038.2(d), and noted that the timetable for repayment was set by *id.* § 9038.-2(e). The only way a reduction in the sum owed could be achieved was through the ministerial task of providing documentation for a select set of phone calls. This one avenue for adjustment was left open because in the final negotiations the FEC accepted an argument as to the status of these calls. There was no indication that this minor concession in any way represented a reopening of full-scale discussions about what were "qualified campaign expenses." At this point the FEC clearly expected the Committee to repay matching funds equal in amount to the nonqualified expenses—all the repayment figures produced by the FEC were calculated this way. Nothing in the record over the eight month audit period suggests that the Committee

notice that the FEC intended to and did produce a final, reviewable action.

**16.** *Cf. Reagan Bush Comm. v. FEC,* 525 F.Supp. 1330, 1334–35, 1338 (D.D.C.1981) (explaining the FEC's informal practice of using interim audits in its review of expenditures under the Presidential Election Campaign Fund Act, 26 U.S.C. §§ 9001–9013, which provides for the financing of general election campaigns). The interim audit is now formally included in the regulations on the FEC's audit and repayment process. *See* 48 Fed.Reg. 5224, 5247–48, 14347, 16237 (1983) (effective Apr. 4, 1983) (to be codified at 11 C.F.R. § 9038.1).

**17.** *See, e.g., Fidelity Television, Inc. v. FCC,* 502 F.2d 443, 448 (D.C.Cir.1974) (per curiam) ("principle of finality in administrative law is not ... governed by the administrative agency's characterization of its action, but rather by a realistic assessment of the nature and effect of the order") (footnote and citations omitted); *Isbrandtsen Co. v. United States,* 211 F.2d 51, 55 (D.C.Cir.) (requirements of finality are not satisfied by agency's label), *cert. denied,* 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954).

However, the fact that an agency's label for its action is not necessarily conclusive does not mean that the label is devoid of significance for a court. *See Pacific Gas & Elec. Co. v. FPC,* 506 F.2d 33, 39 & n. 20 (D.C.Cir.1974) ("Often the agency's own characterization of a particular order provides some indication of the nature of the announcement.") (citing *Columbia Broadcasting Sys. v. United States,* 316 U.S. 407, 416, 62 S.Ct. 1194, 1199, 86 L.Ed. 1563 (1942), which relied in part on the form of regulations in determining that they were subject to review); *Pennzoil Co. v. FERC,* 645 F.2d 394, 399 (5th Cir.1981) (FERC statement that an opinion is interlocutory and that it would be clarified later influences court's determination of finality).

contested the FEC's interpretation of 26 U.S.C. § 9038(b)(2) or advocated the different type of repayment calculation that it now advances.

In sum, we conclude that the FEC's process was designed to arrive at exactly the type of final action that is ready for judicial review. Application of the *Standard Oil-Abbott Laboratories* criteria and the *Rederiaktiebolaget Transatlantic* principles reaffirms that the process in fact produced a final agency action. The repayment amount, including a reasoned explanation about how the FEC arrived at it, is indeed a "definitive statement" of obligation that the FEC is directed to make by statute. Because the administrative review process was complete, judicial review of the determination of obligation certainly could not disrupt the FEC's decisionmaking. The fact that money was supposed to be repaid to the U.S. Treasury within 20 days (with a possible 90-day extension) certainly created a "direct and immediate effect" and the expectation of "immediate compliance." Since this calculation is mandated by 26 U.S.C. § 9038, it also has "the status of law." Moreover, the legal question the Committee wants us to answer—how much of the nonqualified expenses must it repay under *id.* § 9038—was "fit for judicial resolution" after the FEC's final determination.[18] Finally, Congress has expressed a strong interest in resolving federal matching fund audits expeditiously.[19]

The Committee seeks to dissuade us from this conclusion by arguing that this case is similar to those where courts have preserved an appeal right by concluding that agency action is not final because the "agency [left] room for genuine and reasonable doubt as to the applicability of its orders or regulations." *Recreation Vehicle Industry Ass'n v. EPA*, 653 F.2d 562, 569 (D.C.Cir.1981). In *Recreation Vehicle*, EPA "left unclear the applicability of its truck regulations to the motor home industry." *Id.* at 568. This court would not permit EPA to "take advantage of the obscurity of intentions in order to defeat rights statutorily conferred," where the party claiming jurisdiction made a prompt request for clarification that lent credence to its claim that it was confused about the applicability of the regulations. *Id.*

*Sam Rayburn Dam Electric Cooperative v. FPC*, 515 F.2d 998 (D.C.Cir.1975), *cert. denied*, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976), involved a similar problem. In *Sam Rayburn Dam*, the first of two FPC orders was unclear about whether petitioner's rates would be materially affected, and therefore the petitioner did not move for reconsideration until the second order revealed it would in fact be "aggriev-

18. Our conclusion that the FEC's determination of the Committee's repayment obligation was final agency action is buttressed in two respects by *Reagan Bush Comm. v. FEC*, 525 F.Supp. 1330 (D.D.C.1981). *Reagan Bush Committee* noted that under the Presidential Election Campaign Fund Act, 26 U.S.C. §§ 9001–9013, the final repayment determination, which is the analogue to the FEC's July 1981 final repayment determination here, may be appealed to this court. *Id.* at 1335. We see no reason why the point of finality should differ for final repayment determinations under the primary and general election funding acts. Second, the district court issued its decision in *Reagan Bush Committee* on November 17, 1981 —within 30 days of the FEC's notice of its final *calculation* of the repayment amount (October 27). The availability of this judicial statement on when a party may appeal an FEC final repayment decision tends to undermine any argument the Committee might make that it was unaware of the need to appeal.

19. "Congress was troubled by the inability of the FEC to make prompt disclosure of the audit reports it prepared following the 1976 election, and it was this concern that ultimately prompted the [FEC] ... to streamline the audit process." *Reagan Bush Comm. v. FEC*, 525 F.Supp. 1330, 1341 (D.D.C.1981). Chairman Pell of the Senate Committee on Rules and Administration expressed his frustration with the delays during hearings in 1978:

"[I]f [the audit report] is delayed this year and goes on another six months, another year, we are into another campaign before we are through with the ... campaign, so there is no purpose in the whole operation, because nobody is interested in history. And this will become history before we are through."

*Id.* (quoting Transcript of Proceedings, Senate Comm. on Rules and Administration, Mar. 15, 1978, at 14, 16).

ed." The court recognized that petitioner's claim of confusion was reasonable, it had nothing to gain from delaying its protest, and its "speedy filing of an application for rehearing" after it knew it was aggrieved was significant evidence of good faith. 515 F.2d at 1007. The court did not want to:

permit an administrative agency to enter an ambiguous or obscure order, wilfully or otherwise, wait out the required time, then enter an "explanatory" order that would extinguish the review rights of parties prejudicially affected.

*Id.*

The Committee urges that there is analogous confusion here that undermines any finding of final action before June 1982. It contends that the FEC's "final repayment determination" (of either July or October, 1981) could not have been final agency action because the FEC itself did not seem to treat it as such. In particular, the Committee points to the ambiguous letter of February 4, 1982, sent in response to the Committee's proposal for repayment terms. This letter sought both to preserve the FEC's "substantive or procedural rights" and to reassure the Committee that it could get its money back after "final administrative or judicial resolution of the issues in dispute." J.A. at 61. It is, of course, possible to read the FEC's reference to judicial review (even though under the FEC's argument the 30-day period for petitioning for review had already run) as simply a recognition that the Committee had a right to seek judicial review—even if it only culminated in a decision that the court did not have jurisdiction. The FEC has never satisfactorily explained what it had in mind when it referred to *final administrative* resolution.

Nonetheless, we conclude for a number of reasons that the FEC's actions here, and its February 4, 1982 letter in particular, do not warrant any adjustment in our finding that the repayment obligation was final for purposes of review by October 1981. First, the February 4 letter could not possibly have influenced the Committee's decision to appeal within 30 days of the FEC's "final determination" in July 1981 or its final cal-

culation in October 1981 because it was sent long afterwards. Second, the FEC's actions prior to the February 4 letter (and after it, too) followed closely the FEC's audit and repayment assessment process, as set out in its regulations; there was no reason for the Committee to be confused about what was happening during the eight month administrative review of 1980–81 that culminated in the FEC's statement about the Committee's "final" repayment obligation. Third, the FEC's final repayment determination, unlike the agency actions in *Recreation Vehicle* and *Sam Rayburn Dam,* made it crystal clear that the FEC had imposed an obligation and that the Committee was supposed to pay it; this was not a situation where the scope of regulations was unclear or the application of an order was ambiguous. Fourth, while we can only speculate on whether the Committee was trying to reorder the audit and repayment process to its own end, the Committee's actions surely did not approximate the prompt request for clarification in *Recreation Vehicle* or the speedy action to remedy the late filing in *Sam Rayburn Dam.* The Committee did not even raise the legal question about the portion of nonqualified expenses it must repay until December 1981, and its communications regarding the repayment process read more like pronouncements than inquiries. Fifth, we note that even the FEC's February 4 letter warned that the agency was not forfeiting any procedural or substantive rights.

True, the FEC's enigmatic statements in the February 4 letter were an ill-concocted blend of boilerplate and courtesy in the face of the Committee's insistent efforts to establish its own audit and repayment process through unilateral declarations. If Congress' time limits on petitions for review are to have any jurisdictional bite, however, petitioners should not be allowed to overrun them by barraging an agency with missives on its own theories of how the administrative process should operate. The FEC's faltering response, made after the time for appeal had run, does not by itself provide a sufficient justification to stop the statutory

clock. *See Boston Gas Co. v. FERC,* 575 F.2d 975, 978–79 (1st Cir.1978).

### III. Conclusion

We have no jurisdiction to review the FEC's final repayment determination because the Committee failed to file its petition for review "within 30 days after the agency action by the [FEC] for which review is sought," 26 U.S.C. § 9041(a); therefore, the Committee's petition is

*Dismissed.*