839 P.2d 630

**Ruben C. GONZALES, et al., Plaintiffs–Appellants,**

**v.**

**PUBLIC EMPLOYEES RETIREMENT BOARD, Dan Gutierrez, Karleen Boggio, Rudy Lujan, Robert Patterson, Ralph Gallegos, Isidro Delgado, Harroll H. Adams, James B. Lewis, Rebecca Vigil–Giron, K. Rose Wood, and Gerald Grimm, Members of the Public Employees Retirement Board, individually and in their official capacities, Defendants–Appellees.**

No. 11479.

Court of Appeals of New Mexico.

June 29, 1992.

Certiorari Denied Aug. 14, 1992.

Thomas L. Dunigan, Santa Fe, for plaintiffs–appellants.

Tom Udall, Atty. Gen., Michael Dickman, Asst. Atty. Gen., Santa Fe, for defendants–appellees.

## OPINION

PICKARD, Judge.

In this case we are asked to decide what retirement benefits fifty-two former long-term state employees are entitled to receive after having resigned from their state jobs in order to work for local government employers for a short time before retirement. More generally, we are asked to choose between differing versions of the facts and equities of this case.

According to the Public Employees Retirement Board (PERB), plaintiffs claim entitlement to a "free lunch," whereby they, through a nonexistent legislative loophole, seek to get what no other state employees are entitled to. According to PERB, all of the plaintiffs, after working for organizations that democratically elected not to opt for a higher retirement formula (and concomitant higher individual contributions), quit their jobs and worked for new employers (that did elect the higher retirement formula) for as little as a few days, thereby paying as little as a few dollars into the retirement association but increasing their retirement annuities by one to two hundred thousand dollars.

According to plaintiffs, the facts and equities are quite different. According to plaintiffs, each of them, nearing retirement, consulted officials of PERB about their options. They were told that the statutes permitted them to switch employers, as they did, to obtain the higher benefits. Plaintiffs calculated their needs, worked as instructed, and then retired, irrevocably choosing certain options at what they thought would be the higher formula. In fact, had plaintiffs waited a few months to retire, their benefits would have been at the higher formula due to intervening legislation setting all employee benefits at the higher formula. But, plaintiffs having retired when they did, PERB took the posi-

tion that they were entitled only to the lower formula.

The major issues on appeal concern (1) whether the applicable statutes and regulations permit plaintiffs to do what they did to get the higher formula; and (2) if not, whether PERB is estopped to deny plaintiffs the higher benefits. The lower court ruled that the statutes did not permit the result advocated by plaintiffs and that estoppel does not apply. We reverse and hold that as to some plaintiffs, the statutes permit what they did and, as to others, PERB may be estopped to deny them the higher benefits.

While the proceedings below were termed summary judgment, the parties agreed at oral argument that they were more in the nature of a bench trial on partially stipulated facts. While some evidence was taken, most of what was presented below was documents, affidavits, and stipulations that the rest of the evidence would be similar in nature to that presented. The parties agreed, both below and on appeal, that the facts were not in dispute. However, the parties dispute the legal effects of, or inferences to be drawn from, some of those facts. Therefore, we review these proceedings as if they were an appeal from a bench trial and grant relief accordingly.

### I. Facts

Each plaintiff was a state employee in 1985 and had been employed by the state for a period of time ranging from fifteen to forty years. All plaintiffs were members of PERA (the retirement association administered by defendant Board), as required by NMSA 1978, Chapter 10 (as amended). PERA membership contributions were deducted from the salary of each plaintiff, and corresponding employer contributions were made by the state on behalf of each plaintiff. Pursuant to NMSA 1978, Sections 10–11–18 to 10–11–21 (as amended), these monies were held in trust by PERB and invested in order to pay future retirement benefits to plaintiffs and their fellow PERA members.

In 1985, the legislature amended the public employee retirement statutes, in part creating a new type of retirement annuity. Prior to 1985, only superannuation formula "A" was available to plaintiffs. After 1985, the greater superannuation formula "AA" became available to state employees such as plaintiffs, but only if the new formula was adopted by a majority of their fellow state members in a special election. *See* NMSA 1978, § 10–11–18(A) (Cum.Supp. 1986). The adoption would have increased retirement benefits substantially, but employee membership contributions would also have more than doubled, from 3.83% to 8.93% of the salary. *See id.* In an election that included plaintiffs, state membership defeated adoption of superannuation formula AA by majority vote. However, in separate elections, the respective memberships of certain New Mexico municipalities and local governmental entities voted to adopt the increased membership contributions and the correspondingly higher formula AA benefits.

After defeat of formula AA by state employees, each plaintiff resigned from his or her long-term state position and obtained brief employment with a local government whose membership had voted to adopt retirement formula AA. PERB accepted PERA contributions from plaintiffs and their new employers at the AA contribution rate. After a few days or weeks at the new job, each plaintiff "retired" from the local government position. Fifty of the fifty-two plaintiffs worked at hourly rates ranging from less than one-half to one-tenth of the hourly rates previously paid to them in their state jobs. A number of plaintiffs subsequently repaid all or part of their salaries to their municipal or county employers. The record further reflects that plaintiffs were candid about the purpose of their new employments, that being solely to obtain formula AA retirement annuities and increase their retirement benefits by approximately 25% each.

Because plaintiffs were very concerned about the amount of benefits they would be receiving upon retirement, most of them conferred with one or more PERB officials before accepting municipal employment.

They were told that their plan to resign from the state, work a short while for local government, and thereby obtain formula AA retirement benefits was "legal" or "legally permissible" and would entitle them to retire with the higher benefits. Plaintiffs were informed that if they retired from the state, they would be compensated according to the A retirement formula (2% of final average salary per year of work). PERB officials assured plaintiffs, however, that they could resign from the state, go to work for a municipal employer who had adopted the AA benefit formula, and subsequently retire with eligibility for AA benefits (2.5% of final average salary per year of work). Plaintiffs were specifically told that PERB would pay the higher benefits upon retirement from a local government AA employer, and they were given specific figures as to the amount of monthly retirement benefits that would be paid to them under the AA formula. In addition, PERB officials told plaintiffs that no specific or minimum service credit or period of employment with an AA municipal employer was necessary in order to qualify for the higher benefits.

Other evidence indicated that the assistant attorney general who was serving as PERB's counsel at the time confirmed to one PERB official that the agency position regarding the availability of AA benefits to state employees who resigned from state employment and established short-term AA municipal employment as outlined above was correct. As a group, however, the state membership was not informed collectively or systematically about the availability of this "loophole" for increasing retirement benefits. In fact, during the same period of time that plaintiffs retired, about five hundred of their fellow state employees also did so, but under formula A with its lower benefits. Many of these other retirees had also discussed their proposed retirement plans with PERB employees, but they were not given information about qualifying for AA benefits through employment with local government, apparently because they did not ask for such information.

PERB processed plaintiffs' retirement applications and initiated payment of AA benefits to each of them for periods ranging from three to seventeen months. When PERB granted approval for and initiated the payments, it was aware that plaintiffs were former state employees who had resigned from state employment and undertaken AA municipal employment pursuant to the assurances they had received from PERB officials respecting the availability of AA benefits upon retirement from such employment. Moreover, at the time of retirement, plaintiffs irrevocably committed to benefit payment options, such as survivor benefits and lump sum payment plans, based upon their anticipation of receiving the greater monthly AA formula annuity payments. PERB "ratified" payment of AA benefits to the first fifteen plaintiffs to retire. Then, on or about June 30, 1987, PERB changed its position regarding payment of AA benefits to plaintiffs and discontinued them, based on advice from the new attorney general. Had plaintiffs worked for their state employers until October 1986, however, they would have become eligible for AA benefits from the state by operation of law.

In granting judgment to defendants, the court found that PERB officials did make representations to plaintiffs upon which plaintiffs relied to their detriment. The court also found that while the principal purpose of municipal employment in each case was to obtain AA benefits upon retirement, none of the plaintiffs engaged in "sham" employment, but rather all of them established employer-employee relationships with their respective AA municipal employers, and that all of the plaintiffs rendered actual services to their municipal employers. The court found that PERB had accepted contributions at the AA contribution rate from plaintiffs and their municipal employers, as well.

The court ruled, however, that:

no statutory basis exists for allowing formula AA benefits pursuant to the plain language of the governing statutes to wit: Section 10–11–14A, Subsections A(5) and A(7) of Section 10–11–18 and Subsections A, B(6) and C of Section 10–

11–22, NMSA 1978 (1986 Cum.Supp., repealed by Laws 1987, Chapter 253, effective July 1, 1987);

Under the undisputed facts of this case, payment of formula AA benefits to Plaintiffs would produce a legally and logically absurd result and would be inconsistent with the plain statutory language as well as with the otherwise clear, logical and consistent statutory intent and scheme[.]

The court also concluded that plaintiffs who had not filed timely forms to renew membership in PERA and those who had not worked for municipal employers for fifteen days or more were precluded from receiving AA benefits for those additional reasons. Because the court determined that the representations made by PERB officials to plaintiffs contradicted the "plain statutory language," the court declined to apply equitable estoppel against the state.

## II. Sections 10–11–22(C) and 10–11–18(A)(7)

■ Plaintiffs' main reliance is on NMSA 1978, Section 10–11–22(C) (Cum. Supp.1986). In reviewing this case, the first question to be resolved is whether that section is ambiguous and requires interpretation. Section 10–11–22(C) provides:

The amount of annuity to be paid a member who has not previously retired and who acquires credited service under more than one annuity formula shall be proportional to the amount of credited service acquired under each annuity formula, but shall not be less than the amount of annuity if it were computed under the applicable formula at the time of retirement.

Plaintiffs argue that the language "but shall not be less than the amount of annuity if it were computed under the applicable formula at the time of retirement" is clear and unambiguous and entitles them to AA benefits. PERB concedes that the first clause of the statute is clear and unambiguous, but contends that the second part, upon which plaintiffs rely, is not. PERB argued in its brief that the latter clause, "if construed the way Plaintiffs suggest,

would wholly swallow up and obviate the first clause in every case." PERB later conceded at oral argument that the latter clause would not swallow the first clause in cases, for example, in which municipal employees moved to state government.

If a provision is unambiguous, then courts are bound by its "plain meaning." *State v. Elliott,* 89 N.M. 756, 557 P.2d 1105 (1977). Furthermore, the statutory construction adopted by the agency charged with its administration "is persuasive and will not be lightly overturned." *Perea v. Baca,* 94 N.M. 624, 627, 614 P.2d 541, 544 (1980); *State ex rel. Battershell v. City of Albuquerque,* 108 N.M. 658, 662, 777 P.2d 386, 390 (Ct.App.1989). Given these principles of construction, the language of the judgment below is problematic because the court found the language of the statute to be "plain" yet went on to engage in statutory interpretation, which conflicted with the agency's admitted long-standing construction of the statute.

We are unable to agree with the district court's conclusion that Section 10–11–22(C) plainly precluded payment of AA benefits to plaintiffs. As we read the statute, it plainly requires such payments.

The trial court apparently felt that Section 10–11–22(C) should have had a durational component and resorted to Section 10–11–18(A)(7) (requiring municipal employees who transfer from an A to an AA benefit unit to work five years before obtaining AA eligibility) to provide one. Indeed, defendants argue in the alternative that plaintiffs were either state employees bound by irrevocable elections that defeated adoption of AA benefits, or that they were transferring municipal employees required to serve five additional years before qualifying for AA benefits. Having reviewed these statutes, we do not find either of these arguments persuasive. We cannot conclude that a state employee is forever bound by an election which took place while he or she occupied one job with the state, after resigning and going to work for another employer; nor does it seem logical to apply Section 10–11–18(A)(7) to plaintiffs when they clearly were not transferring

*municipal* employees at the time they resigned from state employment and obtained new jobs with municipal employers.

Defendants rely on the case of *Pysz v. Contributory Retirement Appeal Board,* 403 Mass. 514, 531 N.E.2d 259 (1988). In *Pysz,* the plaintiff resigned from his long-term state government position and took a "hazardous" category state job two weeks before retirement in order to qualify for the higher retirement benefits associated with the second job. The plaintiff's second employer acknowledged that he did not consider the plaintiff to be a bona fide employee with responsibilities relating to his new job. *Id.* 531 N.E.2d at 260. The Massachusetts Supreme Judicial Court upheld the lower court's determination that the second employment was a "sham" and refused to allow the plaintiff to receive the greater benefits, finding that it would be an unreasonable, absurd result, despite the fact that a literal interpretation of the statute at issue permitted such an action. *Id.* 531 N.E.2d at 260–61.

The *Pysz* case is distinguishable on its facts. In this case, the district court specifically found that plaintiffs' local government employment was not sham employment—that plaintiffs provided actual employment services to their municipal employers. Furthermore, we are not persuaded by the reasoning in *Pysz.* We do not believe that application of the plain language of Section 10–11–22(C) produces an unreasonable or absurd result.

We hold therefore that the trial court erred—that Section 10–11–22(C) plainly created the "loophole" of which plaintiffs were undeniably encouraged to avail themselves by PERB officials.

*III. NMSA 1978, Section 10–11–14(A); PERA Rules 400.10, 400.20, and 600.10; and the Doctrine of Equitable Estoppel*

■ The district court ruled that twelve of the plaintiffs were barred in any case from receiving AA benefits because they did not complete timely application forms to renew their PERA membership based on their municipal employment. PERA Rules

400.10 and 400.20 make clear that "employees ... who are employed in part-time or temporary positions" must complete such an application within the first pay period of such employment.

Plaintiffs argue that the rule does not apply to them because they did not fill "part-time or temporary positions" as defined in Rule 400.20. We believe that plaintiffs are correct. Our review of the record reveals no evidence to substantiate the claim that the AA municipal employment positions taken by plaintiffs were part-time or temporary as those words are defined. To the contrary, the evidence produced below suggests that plaintiffs were employed in regular full-time positions, albeit for short durations. This being the case, renewed membership applications under PERA Rules 400.10 and 400.20 were not required.

■ The district court also agreed with defendants that Section 10–11–14(A) (Cum. Supp.1986) and Rule 600.10 precluded thirty of the fifty-two plaintiffs from receiving AA benefits because they worked less than fifteen days for their municipal employers. We believe that the trial court's reasoning as to these thirty plaintiffs was correct. The versions of Section 10–11–14(A) and Rule 600.10 applicable to plaintiffs provided that no PERA member be credited with a month's service toward retirement for any month in which the employee worked less than fifteen days, nor for a year's service for less than twelve months of service in a calendar year. The implication of this section and rule is that PERB calculated service toward retirement on a monthly or yearly, rather than a daily or weekly, basis. Because Section 10–11–22(C) requires "credited service" under more than one formula, PERB officials were incorrect when they led plaintiffs to believe that they need not stay employed with the municipalities for any particular length of time in order to qualify for greater retirement benefits.

■ The fact that PERB officials misinformed plaintiffs concerning this requirement leads us to the next question of

whether the state should be estopped from denying the greater benefits because state officials misled plaintiffs. We first address defendants' contention that application of the doctrine of equitable estoppel is precluded in this case under the reasoning of *State ex rel. Reynolds v. McLean,* 76 N.M. 45, 412 P.2d 1 (1966). In particular, defendants rely upon the supreme court's observation in *McLean* that "the law is well settled that where the facts are equally well known to both parties, the expression of an opinion on a matter of law raises no estoppel." *Id.* at 47, 412 P.2d at 3.

We believe defendants' reliance on *McLean* is misplaced. *McLean* did not involve the espousal of two inconsistent positions by a state agency—the State Engineer's office took the same legal position in the lawsuit in that case that it had taken previously. In addition, the *McLean* court found that as to the defendant property owner, "there was no lack of knowledge and of the means of knowledge of the truth as to the facts in question." *Id.* at 48, 412 P.2d at 3. Moreover, *McLean* was essentially limited to its facts by the court's comment that "[b]y nothing that we have said herein do we mean to imply whether, under different facts than here present, an estoppel can or cannot be asserted against the state." *Id.*

The analysis in *McLean* is not controlling here, where the state took contradictory positions as to plaintiffs' entitlement to benefits after the new attorney general took office; plaintiffs had a lack of knowledge and of the means of knowledge concerning the agency's understanding and application of Section 10–11–14(A) and Rule 600.10, which could only be addressed by resort to the agency's officers; also, plaintiffs were informed as a matter of fact that PERB was applying the statute and its own regulation concerning credited service to permit the actions taken by plaintiffs. We believe this case is more like *Kuge v. State Department of Administration, Division of Retirement,* 449 So.2d 389 (Fla. Dist.Ct.App.1984), and *Nevada Public Employees Retirement Board v. Byrne,* 96 Nev. 276, 607 P.2d 1351 (1980), where the courts held that specific statements concerning amounts of retirement benefits were statements of fact sufficient to warrant application of estoppel.

The trial court did not apply equitable estoppel in this case because it found that "the statements by state officials ... contradict the plain statutory language and do not warrant imposition of equitable estoppel against PERB or the State of New Mexico." In so ruling, the trial court did not cite to a specific statute. We have held that the trial court's determination that Section 10–11–22(C) plainly prohibited payment of "AA" benefits to plaintiffs was incorrect as a matter of law and must be reversed. Furthermore, while we essentially agree with the district court's interpretation of Section 10–11–14(A) and Rule 600.10, we do not find that either the statute or the rule is a sufficient model of clarity, the plain meaning of which can be charged against plaintiffs. *Cf. Trujillo v. Gonzales,* 106 N.M. 620, 622, 747 P.2d 915, 917 (1987) (plaintiff had no right to rely on oral representations made by municipal agents contrary to applicable statute when language of applicable statute was clear). In particular, plaintiffs could have believed that Section 10–11–14(A) and Rule 600.10, governing service credit, applied only to determine the number of months they worked for the purpose of determining how many years or fractions thereof should be multiplied by the appropriate percentage of their salaries to yield the total amount of their annuities under the various paragraphs of Section 10–11–22(B). For these reasons, we believe that re-examination of whether equitable estoppel should be applied is warranted in this case. To make this determination, further resolution of factual matters is necessary. *See Green v. New Mexico Human Servs. Dep't, Income Support Div.,* 107 N.M. 628, 762 P.2d 915 (Ct.App.1988); *see also Driscoll v. City of Los Angeles,* 67 Cal.2d 297, 61 Cal.Rptr. 661, 431 P.2d 245 (1967) (en banc) (existence of estoppel is generally a question of fact).

*Green* also involved a question as to whether equitable estoppel should be applied against a state agency. In that case

we vacated a hearing officer's decision that equitable estoppel was not at issue because of the mandatory operation of the "lump sum rule" affecting welfare benefits. *Green v. New Mexico Human Servs. Dep't, Income Support Div.*, 107 N.M. at 629, 762 P.2d at 916. We held that this reasoning was incorrect as a matter of law and remanded the case because resolution of the question of whether equitable estoppel was warranted required both determinations of the credibility of witnesses and decisions as to what inferences should be drawn from the evidence, as well as further factual findings concerning whether all the requisite elements of equitable estoppel were present in the case. *Id.* at 629–31, 762 P.2d at 916–18.

New Mexico courts will apply the doctrine of equitable estoppel against the State when "right and justice demand it." *See, e.g., State ex rel. Dep't of Human Servs. v. Davis*, 99 N.M. 138, 654 P.2d 1038 (1982); *Stuckey's Stores, Inc. v. O'Cheskey*, 93 N.M. 312, 600 P.2d 258 (1979), *appeal dismissed*, 446 U.S. 930, 100 S.Ct. 2145, 64 L.Ed.2d 783 (1980); *State ex rel. State Highway Dep't v. Shaw*, 90 N.M. 485, 565 P.2d 655 (1977). To determine whether estoppel is warranted, the conduct of both the party to be estopped and the party seeking relief must be examined.

■ As to the party to be estopped, the evidence must show (1) conduct amounting to false representation or concealment of material facts, (2) knowledge or constructive knowledge of the true facts, and (3) an intention or expectation that the innocent party will act on the representations made. *Green v. New Mexico Human Servs. Dep't, Income Support Div.*, 107 N.M. at 629, 762 P.2d at 916; *Stuckey's Stores, Inc. v. O'Cheskey*, 93 N.M. at 324, 600 P.2d at 270 (quoting *Westerman v. City of Carlsbad*, 55 N.M. 550, 555–56, 237 P.2d 356, 359 (1951)). Misrepresentations contrary to the material facts to be relied on, even when made innocently or by mistake, will support application of the doctrine. *Green v. New Mexico Human Servs. Dep't, Income Support Div.*, 107 N.M. at 629, 762 P.2d at 916. Two

supreme court cases also suggest that the degree of aggravated or overreaching conduct on the part of the state is an additional factor to be evaluated in deciding whether equitable estoppel is warranted, but neither case holds that such conduct is a necessary factor. *See National Advertising Co. v. State ex rel. State Highway Comm'n*, 91 N.M. 191, 194, 571 P.2d 1194, 1197 (1977); *State ex rel. State Highway Dep't v. Yurcic*, 85 N.M. 220, 223, 511 P.2d 546, 549 (1973).

■ The party seeking enforcement of equitable estoppel must show (1) lack of knowledge of the true facts in question, and (2) detrimental reliance on the other party's conduct. *Green v. New Mexico Human Servs. Dep't, Income Support Div.*, 107 N.M. at 629–30, 762 P.2d at 916–17. In addition, the New Mexico Supreme Court has recently amplified these elements, specifying that the party seeking to assert the doctrine must also demonstrate that its reliance was reasonable. *Taxation and Revenue Dep't v. Bien Mur Indian Market Ctr., Inc.*, 108 N.M. 228, 231, 770 P.2d 873, 876 (1989). We believe that the trial court could find that plaintiffs' reliance was reasonable. At the time they made their decisions, plaintiffs did not know of the exact actuarial value of their annuities. The value, which PERB used to show that reliance was not reasonable, was calculated for purposes of the proceedings below. At the time plaintiffs retired, they knew only that benefits would be calculated pursuant to formula AA and what those periodic benefits would be. Additionally, as shown by the decision in *State ex rel. Helman v. Gallegos*, 114 N.M. 414, 839 P.2d 624 (Ct. App.1992), filed today, changes in state pension statutes often result in extraordinary benefits for retirees. Thus, there is nothing necessarily highly suspicious in advice that plaintiffs could work for a short period of time to be entitled to the higher benefit formula.

In this case, the trial court found that plaintiffs relied to their detriment on the information given them by PERB officials. The trial court did not make specific findings, however, concerning the other ele-

ments of equitable estoppel. Because such determinations would involve re-examination and weighing of the evidence and inferences to be drawn from that evidence, as in *Green*, we remand this matter to the trial court to determine whether in light of our ruling concerning Section 10–11–22(C) and our discussion of Section 10–11–14(A) and Rule 600.10, and in light of case law setting forth the elements of equitable estoppel, justice demands that the state should be equitably estopped from denying AA benefits to these thirty plaintiffs.

In the answer brief, defendants raise two final issues relating to the issues of sham employment and constitutional provisions prohibiting recovery. We have reviewed these claims and find them to be without merit. As to the issue of sham employment, the trial court found that none of the plaintiffs engaged in or concocted sham employment, and that all of the plaintiffs provided actual services to their municipal employers. Our review of the record supports the trial court's ruling on this matter. *Cf. Pysz v. Contributory Retirement Appeal Bd.* (plaintiff's second employer admitted plaintiff was not a bona fide employee).

■ Defendant's constitutional argument is premised upon Article IV, Sections 27 and 31, and Article IX, Section 14, of the New Mexico Constitution. These provisions prohibit the state from giving extra compensation to any public officer after services have been rendered, and from making donations to any person or private entity. Plaintiffs were rendering service as public employees and were all contributing members to the retirement fund when the annuity enhancement legislation was enacted. This being so, the authorities relied upon by defendants do not raise a constitutional problem for plaintiffs. *See, e.g., State ex rel. Hudgins v. Public Employees Retirement Bd.*, 58 N.M. 543, 273 P.2d 743 (1954) (constitution did not prohibit employees who had annuitant status under prior legislation from participating in increased benefits conferred by later legislation provided they elected to do so by paying an additional lump sum of money); *cf., e.g., State ex rel. Sena v. Trujillo*, 46

N.M. 361, 129 P.2d 329 (1942) (constitutional violation found where trial court applied pension statute to public employee who left public service prior to statute's enactment).

Accordingly, the trial court is reversed as to the entitlement of twenty-two of the plaintiffs to "AA" benefits under Section 10–11–22(C), and this matter is remanded to the trial court to determine whether, as to the remaining thirty plaintiffs who worked less than fifteen days for their local government employers, the state should be equitably estopped from denying the greater benefits.

IT IS SO ORDERED.

ALARID, C.J., concurs.

WILLIAM W. BIVINS, J., concurs in part and dissents in part.

BIVINS, Judge (concurring in part; dissenting in part).

I concur in the portion of the opinion which holds that NMSA 1978, Section 10–11–22(C) (Cum.Supp.1986), allows Plaintiffs to do what they did, and in the portion of the opinion which holds that Plaintiffs did not hold temporary or part-time positions as defined by PERA Rule 400.20. I also agree with the discussion of the sham employment issue, and the constitutional issues raised.

I cannot, however, agree that equitable estoppel might be applied against PERB to determine that those Plaintiffs who worked for less than fifteen days can be credited with service despite the requirements of NMSA 1978, Section 10–11–14(A) (Cum. Supp.1986). I therefore dissent in that portion of the opinion.

## A. EQUITABLE ESTOPPEL

### 1. New Mexico's Test

New Mexico's present test for the application of equitable estoppel can be traced back to 1951. *See Westerman v. City of Carlsbad*, 55 N.M. 550, 555–56, 237 P.2d 356, 359 (1951). The test is set forth as follows:

"The essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming estoppel, they are: (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially."

*Id.* (quoting 19 Am.Jur. *Estoppel* § 42 (1939)); *see also Regents of the Univ. of New Mexico v. Lacey,* 107 N.M. 742, 745, 764 P.2d 873, 876 (1988); *Cauble v. Beals,* 96 N.M. 443, 445, 631 P.2d 1311, 1313 (1981); *Capo v. Century Life Ins. Co.,* 94 N.M. 373, 377, 610 P.2d 1202, 1206 (1980); *Augustus v. John Williams & Assocs.,* 92 N.M. 437, 440, 589 P.2d 1028, 1031 (1979); *Stuckey's Stores, Inc. v. O'Cheskey,* 93 N.M. 312, 324, 600 P.2d 258, 270 (1979); *State ex rel. State Highway Dep't v. Shaw,* 90 N.M. 485, 487, 565 P.2d 655, 657 (1977); *National Advertising Co. v. State ex rel. State Highway Comm'n,* 91 N.M. 191, 193–94, 571 P.2d 1194, 1196–97 (1977); *Las Cruces Urban Renewal Agency v. El Paso Elec. Co.,* 86 N.M. 305, 310–11, 523 P.2d 549, 554–55 (1974); *State ex rel. State Highway Dep't v. Yurcic,* 85 N.M. 220, 223, 511 P.2d 546, 549 (1973); *Kerr v. Schwartz,* 82 N.M. 63, 66, 475 P.2d 457, 460 (1970); *Yates v. Ferguson,* 81 N.M. 613, 615, 471 P.2d 183, 185 (1970); *Gray v. Estate of Williams (In re Will of Williams),* 71 N.M. 39, 68–69, 376 P.2d 3, 23 (1962); *South Second Livestock Auction, Inc. v. Roberts,* 69 N.M. 155, 162, 364 P.2d 859, 864 (1961); *Tapia v. City of Albuquerque,* 104 N.M. 117, 122, 717 P.2d 93, 98 (Ct.App.1986). *See generally* 28 Am.Jur.2d *Estoppel & Waiver* § 35 (1966).

### 2. Estoppel Against the State

As a general rule, courts are reluctant to apply the doctrine of equitable estoppel against the state. Numerous New Mexico cases, however, recognize an exception to this rule and will apply estoppel against the state where "right and justice demand it." Some courts follow the proposition that " '[a] state cannot be estopped by the unauthorized acts or representations of its officers. It may be estopped only by an act of the legislature where the legislature possesses the sole power to bind it in the transaction in which an estoppel is alleged to arise.' " *National Advertising,* 91 N.M. at 191, 571 P.2d at 1196 (quoting *Ross v. Daniel,* 53 N.M. 70, 75, 201 P.2d 993, 996 (1949)). Other courts will not apply estoppel against the state unless there is a "shocking degree of aggravated and overreaching conduct." *Yurcic,* 85 N.M. at 223, 511 P.2d at 549, *quoted in National Advertising,* 91 N.M. at 194, 571 P.2d at 1197.

### 3. The Majority's Analysis

The majority opinion sets forth a three-part test for estoppel, citing to *Green v. New Mexico Human Services Department,* 107 N.M. 628, 629–30, 762 P.2d 915, 916–17 (Ct.App.1988). The opinion, however, does not establish how each element of the test has been met. I have particular difficulty seeing how the second prong of the test requiring that PERB had "knowledge or constructive knowledge of the true facts" has been met in this case. *Id.* I find nothing in the record showing that PERB representatives knew of the "true" interpretation of the statute when they talked with Plaintiffs. In addition, I do not believe we can, in every instance, charge an agency with constructive knowledge of the "true" interpretation or meaning of a statute it is to administer. This would render all internal administrative rulemaking and regulatory guidelines meaningless. While it is true that an agency's interpretation of such statutes is given some deference, judicial interpretations conflict with agency interpretations frequently enough to render it impossible to charge an agency with this

kind of knowledge.[1]

In addition, although the opinion suggests, citing to *Green,* that misrepresentations made innocently or by mistake will support the application of the doctrine of estoppel, I do not believe that this eliminates the "knowledge" prong of the test. The *Green* court relies on *Stuckey's Stores, Inc. v. O'Cheskey,* 93 N.M. 312, 324, 600 P.2d 258, 270 (1979), stating that "representations that are contrary to the essential facts to be relied on, *even when made innocently or by mistake,* will support the application of the estoppel doctrine." *Green,* 107 N.M. at 629, 762 P.2d at 916 (emphasis added). *Stuckey's* arrives at this conclusion by relying on *State ex rel. State Highway Department v. Shaw,* 90 N.M. 485, 565 P.2d 655 (1977). The *Shaw* court held that a claim of estoppel would prevail against the state where it was clear that the state was adopting a position contrary to its earlier representations to the defendants, and that these representations, even though made innocently or by mistake, would support the application of estoppel against the state. *Id.* at 488, 565 P.2d at 658. The *Shaw* court purported to apply the *Yurcic* test claiming that estoppel is triggered when the " 'conduct ... is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert ...' " *Id.* (quoting *Yurcic,* 85 N.M. at 223, 511 P.2d at 549). The *Shaw* court, however, appears to apply only the first prong of the test and neglects to analyze the third prong which requires "knowledge, actual or constructive, of the real facts." *Yurcic,* 85 N.M. at 223, 511 P.2d at 549.

Our supreme court has made clear, in cases after *Shaw* and *Stuckey's,* that the test for equitable estoppel has not changed. *See, e.g., Lacey,* 107 N.M. at 745, 764 P.2d at 876; *Cauble,* 96 N.M. at 445, 631 P.2d at 1313; *Capo,* 94 N.M. at 377, 610 P.2d at 1206. In fact, in *Cauble,* the supreme court refused to apply the doctrine of equitable estoppel against a landowner when

the third prong of the test—the requirement of knowledge of the real facts—was not met. 96 N.M. at 445–46, 631 P.2d at 1313–14.

### 4. Reasonable Reliance

The majority explains that the party seeking enforcement of estoppel must show that it lacked knowledge of the true facts in question and that it reasonably relied on the other party's conduct to its detriment. The majority opinion cites to *Trujillo v. Gonzales,* 106 N.M. 620, 622, 747 P.2d 915, 917 (1987), for the proposition that an individual has no right to rely on oral representations made when the language of the applicable statute is clearly to the contrary. Section 10–11–14(A) and Rule 600.10 state in part, "in no case shall any member be credited with a month of service for less than fifteen days of service in any calendar month." I think this language is sufficiently clear to render Plaintiffs reliance on any contrary representations made by PERB to be unreasonable. *See also Taxation & Revenue Dep't v. Bien Mur Indian Mkt. Ctr.,* 108 N.M. 228, 231, 770 P.2d 873, 876 (1989) (reliance of party seeking to assert equitable estoppel must be reasonable). In addition, our supreme court has previously held that an individual who "ignores highly suspicious circumstances ... cannot invoke the doctrine of estoppel." *Patten v. Santa Fe Nat. Life Ins. Co.,* 47 N.M. 202, 208, 138 P.2d 1019, 1023 (1943). As PERB explains, one plaintiff, typical of the other plaintiffs involved in this action, earned $230.77 for ten days of work before she "retired" from her job with the City of Belen. In return for this employment with the City of Belen, she claims entitlement to over $203,000 in additional retirement benefits. I believe this is suspicious enough to alert Plaintiffs that the advice received may be inaccurate or at least worthy of further investigation.

### 5. Policy Considerations

In addition to New Mexico law, I believe the recent United States Supreme Court

---

1. American Jurisprudence explains that "the general rule is that it is essential ... that the party sought to be estopped should have had knowledge of the facts, or at least that he should have had the means at hand of knowing all the facts, or have been in such a position that he ought to have known them." 28 Am.Jur.2d *Estoppel* § 40 (1966) (footnotes omitted).

opinion in *Office of Personnel Management v. Richmond,* 496 U.S. 414, 433, 110 S.Ct. 2465, 2476, 110 L.Ed.2d 387 (1990), *cited in Wing Pawn Shop v. Taxation & Revenue Dep't,* 111 N.M. 735, 745, 809 P.2d 649, 659 (Ct.App.1991) (Hartz J., specially concurring), provides guidance. In *Richmond,* the Court held that erroneous written and oral advice given by a government employee to a benefit claimant could not give rise to estoppel against the government and entitle the claimant to monetary payment not otherwise permitted by law. *Id.* at 416, 110 S.Ct. at 2467. The Court reasoned that although mistakes occur, one can usually assume that government agents are conscientious and generally provide valuable free information to citizens who seek advice about certain government programs. In fact,

> [t]he natural consequence of a rule that made the Government liable for the statements of its agents would be a decision to cut back and impose strict controls upon Government provision of information in order to limit liability. Not only would valuable informational programs be lost to the public, but the greatest impact of this loss would fall on those of limited means, who can least afford the alternative of private advice. The inevitable fact of occasional individual hardship cannot undermine the interest of the citizenry as a whole in the ready availability of Government information.

*Id.* at 433–434, 110 S.Ct. at 2476 (citation omitted). *See generally* Michael Braunstein, *In Defense of a Traditional Immunity—Toward An Economic Rationale for Not Estopping the Government,* 14 Rutgers L.J. 1 (1982). I find this reasoning to be persuasive.

Because I cannot agree that equitable estoppel might be applied against PERB, I respectfully dissent from that part of the majority opinion.