805 P.2d 70

Patricia ELLINGWOOD, Individually and as the Personal Representative of the Estate of James M. Streeter, deceased, Plaintiff–Appellant,

v.

N.N. INVESTORS LIFE INSURANCE COMPANY, INC., a foreign corporation authorized to do business in New Mexico, and Theodore H. Brothers, Individually and as Agent for N.N. Investors Life Insurance Company, Inc., Defendants–Appellees.

No. 18584.

Supreme Court of New Mexico.

Jan. 15, 1991.

The Branch Law Firm, Turner W. Branch, Floyd W. Lopez, Albuquerque, for plaintiff-appellant.

Rowley & Parker, Warren F. Frost, Clovis, for defendants-appellees.

## OPINION

RANSOM, Justice.

This case involves the authority of an insurance agent to bind an insurance company to a contract for temporary insurance on the basis of oral representations concerning immediate coverage upon payment of a premium. Patricia Ellingwood, as personal representative of the estate of James Streeter, brought suit against N.N. Investors Life Insurance Company, Inc. for breach of contract and against the company and its agent for negligence. The trial court granted summary judgment in favor of N.N. Investors because the enrollment application unambiguously stated coverage was not effective unless and until it was approved by the company. The court also concluded that in his application Streeter made material misrepresentations of fact that, in any case, gave N.N. Investors the right of rescission. We reverse, holding that issues of fact exist as to whether the agent had the apparent authority to bind the company to a contract for temporary insurance and whether Streeter made material misrepresentations.

Streeter was twenty-five when, on October 30, 1985, he applied for life and health insurance from N.N. Investors. He had a severe case of scoliosis, a congenital deformity of the spine that was readily apparent, but no physical examination or interview with a medical professional was required in connection with the application for insurance. The company's agent conducted an interview at Streeter's place of business where he worked as a self-employed manager of a donut shop. The agent asked Streeter questions printed on enrollment application forms and then filled out the forms after Streeter verbally answered the questions.

The forms did not include a specific question regarding scoliosis and no mention of that condition by name was included on the completed application. However, Streeter's "no" answers to questions 14(b) and 14(h) are asserted to have been misrepresentations in view of Streeter's congenital deformity. These questions read:

14. Has any person proposed for insurance EVER had any indication, diagnosis, or treatment of

&ast; &ast; &ast; &ast; &ast; &ast;

b. The respiratory system, including but not limited to shortness of breath, persistent hoarseness or cough, asthma, bronchitis, emphysema, tuberculo-

sis, or chronic respiratory disorder? [Answer: No]

 * * * * * *

h. Neuritis, arthritis, gout, disorder of the muscles or bones, including but not limited to spine, back, or joints? [Answer: No]

Following these questions, on lines provided for the explanation of any "yes" answers, with reference to question 14 the agent recorded that Streeter's lower spine had been surgically fused in October 1980. The name, address, and telephone number of the treating physician was provided. The agent also made a notation that Streeter was fully recovered and would accept a rider or limitation of coverage.

Streeter paid the agent the first payment due on the life and health insurance policies. Streeter's grandmother, who was present at the time, later testified that the agent told Streeter that he was fully covered by the policies as soon as he paid the premium. After completing the enrollment application, both the agent and Streeter signed the application. Immediately above Streeter's signature the following language appears:

I declare that the statement and answers in the application are complete and true to the best of my knowledge and belief and all information given to the representative has been recorded correctly and in its entirety. I agree that (a) this application will form a part of the certificate (b) the representative does not have the authority on behalf of the Company to accept risks, or to make, alter or amend the certificate or to extend the time for making any payment due on such certificate and (c) no insurance will take effect until the application is approved by the Company and the certificate is delivered to the Applicant while the conditions affecting insurability are as described herein and the first premium has been paid in full. I hereby acknowledge receipt of a copy of the Fair Credit Reporting Act and Medical Information Bureau notices.

This authorizes any licensed physician, medical practitioner, hospital, clinic or other medical or medically related facility, insurance company, the Medical Information Bureau or other organization, institution or person, that has any record or knowledge of me or my family, to give N.N. Investors Life Insurance Company, Inc., any such information. A photographic copy of this authorization shall be as valid as the original. I UNDERSTAND THAT COVERAGE IS NOT EFFECTIVE UNLESS AND UNTIL APPROVED AND ISSUED BY THE COMPANY.

Streeter also signed two acknowledgement forms in connection with health insurance, one for a group major medical policy, the other for a group catastrophic hospital expense benefit plan. Both forms contained the following:

Upon my request, your representative, whose signature appears below, visited me to determine my interest in applying for insurance with your company. Your representative was courteous and fully and completely explained to me from the same certificate, all the provisions as contained in the certificate, including every benefit, exclusion, limitation, waiting period, and deductible, if any. Your representative asked each question on the enrollment application which I signed only after a full review of the provisions and all the answers had been filled in. The answers to the health questions were fully answered to the best of my knowledge, and all the answers on the application are exactly those, with nothing left out, which I in any way related or stated to the representative. I fully understand and agree that if any material information is omitted from the application, it could provide the basis for the Company to refuse coverage and to refund all my premiums as though my coverage had never been enforced. In signing this form, I agree that I have carefully examined and understand the provisions of the specimen certificate and application, and that the Company is not bound by any knowledge or statement made by or to the representative, unless set forth here on the application.

I hereby acknowledge receipt of the Outline of Coverage for Group Catastrophic Hospital Expense Benefits. I understand that coverage is not effective unless and until approved by the Company.

The language in the above forms indicates that insurance coverage was not in force until the application was approved. The sample certificate that the agent used during the interview to explain coverage and benefits stated that coverage would begin on the date shown in the certificate schedule once the company had approved the enrollment application.

The application subsequently was forwarded to the underwriting department of N.N. Investors which, based only on the information contained in, that application, issued Streeter a certificate of insurance for major medical and catastrophic hospital expenses and term life insurance. The health insurance coverage included a special exceptions rider excluding from coverage "any disorder and/or disease of, or injury to, the cervical, thoracic, lumbar or sacroiliac spine on James Streeter." Both health policies excluded coverage for an illness that was a pre-existing condition as defined by the certificate of insurance.[1] As stated on the certificate schedule, the effective date of coverage for all three policies was to be 12:00 noon, November 12, 1985.

Following a hunting trip, Streeter brought himself to the emergency room of the Clovis High Plains Hospital on November 10, 1985. He was diagnosed as having severe bronchial pneumonia. Shortly thereafter, at 3:40 a.m. on November 12, he died. Upon receiving claims under the life and health insurance policies, N.N. Investors initiated an investigation of Streeter's medical history and for the first time sought and obtained medical records from the family physician and surgeon listed on the application forms. N.N. Investors states that at this time they discovered that the purpose of the 1980 surgery to fuse his spinal column was the correction of a "severe deformity associated with scoliosis which Mr. Streeter had suffered since birth." They stated they also discovered that he had been admitted to the medical intensive care unit due to pulmonary compromise during the 1980 hospitalization.

N.N. Investors refused to pay any benefits under any of the policies stating that Streeter had failed to disclose (1) his scoliosis and (2) the incident of pulmonary compromise. N.N. Investors asserted that the nondisclosure amounted to material misrepresentations that formed the basis for a right of rescission and returned all of Streeter's premiums. In addition to the initial premium Streeter paid in October, N.N. Investors also refunded two premiums they had withdrawn from his bank account in November and December pursuant to an arrangement for automatic withdrawals. Since the initiation of suit, N.N. Investors also claims to have discovered that Streeter was hospitalized at least thirteen other times for treatment of scoliosis and that he suffered from a "severe restrictive pulmonary defect" that greatly reduced his lung capacity. Records are said to show that he was hospitalized for the treatment of pneumonia three times between the years 1961 and 1962 (when Streeter was approximately eighteen months of age).

N.N. Investors also denies coverage based upon the stated effective date of coverage contained in the certificate of insurance issued for each policy. Streeter

---

1. A pre-existing condition under the major hospital expense coverage was defined as
 a medical condition not disclosed on the application for which, prior to the effective date of coverage:
 1. Medical advice or treatment was recommended by, or received from a Doctor within the five-year period before the effective date of coverage; or
 2. Symptoms existed which would cause an ordinary prudent person to seek diagnosis, care or treatment within the five-year period before the effective date of coverage.
 Pre–Existing Conditions are not covered unless the loss for such conditions begins more than two years after the effective date of coverage.
 Also, those medical conditions excluded from coverage by name or specific description when the loss begins, are not covered.

died at 3:40 a.m. on November 12 and N.N. Investors claims the life insurance policy did not come into effect until 12:00 noon, about eight hours later. In addition, arguing the health policies were not effective until November 12, N.N. Investors claims Streeter's pneumonia was a pre-existing condition in light of the fact he was admitted for treatment of that condition two days earlier on November 10.

■ Ellingwood appeals from an order of summary judgment against her on all issues. In reviewing that decision, to determine if genuine issues of material fact are present, we examine affidavits submitted in opposition to the motion, as well as pleadings, interrogatories, depositions, and admissions, if any, in a light most favorable to Ellingwood's claims. *Barber's Super Markets, Inc. v. Stryker*, 81 N.M. 227, 229, 465 P.2d 284, 286 (1970); *Wheeler v. Board of County Comm'rs*, 74 N.M. 165, 171, 391 P.2d 664, 668 (1964). The party opposing the motion is to be given the benefit of all reasonable doubts in determining if a genuine issue exists. *Goodman v. Brock*, 83 N.M. 789, 792, 498 P.2d 676, 679 (1972). Where the evidence is susceptible to reasonable conflicting inferences bearing upon material facts, entry of summary judgment is improper. *Fischer v. Mascarenas*, 93 N.M. 199, 201, 598 P.2d 1159, 1161 (1979); *Ute Park Summer Homes Ass'n v. Maxwell Land Grant Co.*, 77 N.M. 730, 732, 427 P.2d 249, 251 (1967); *Hewitt–Robins, Inc. v. Lea County Sand & Gravel, Inc.*, 70 N.M. 144, 148, 371 P.2d 795, 797 (1962).

■ The threshold issue in this appeal is whether the insurance coverage may be found to have been effective earlier than noon, November 12. Ellingwood claims the facts of this case give rise to an issue of temporary insurance coverage. We agree. Streeter's grandmother, who sat at the table with the agent and Streeter while they discussed the insurance coverage, stated that, when Streeter was signing the forms the agent handed him, Streeter asked when coverage under the three policies would begin. According to Streeter's grandmother the agent stated that the policies would be in force as soon as Streeter wrote a check for payment. She stated that Streeter wrote the check and handed it to the agent who replied, "Coverage is now in effect." N.N. Investors admits that the agent accepted payment but denies that he made any statements regarding immediate coverage. Ellingwood also submitted affidavits from other former customers of this particular agent to show that, despite the language to the contrary in the application forms, it was his usual procedure to represent immediate coverage with payment of the first premium. This evidence is sufficient to create a jury issue on the question of whether the agent acted within his apparent authority to bind N.N. Investors to a contract for temporary insurance based upon his oral representations.[2]

■ In the absence of a statute to the contrary, an insurance agent may consummate a valid oral contract for immediate coverage in order that an insured will not remain unprotected during the interval prior to the issuance and delivery of a policy. *See Western Farm Bureau Mut. Ins. Co. v. Barela*, 79 N.M. 149, 441 P.2d 47 (1968);

2. In general, the cases that Ellingwood brings to our attention, where the court has found a contract for temporary insurance after payment of the initial premium, are not helpful here. These cases stand for the proposition that where the company has accepted the initial premium and issued a conditional binder or conditional receipt, stating that the insurance is in force *from the date of application*, provided the application is approved and accepted at the home office, such a binder will give rise to a contract of temporary insurance subject only to cancellation by the company. *E.g., Collister v. Nationwide Life Ins. Co.*, 479 Pa. 579, 388 A.2d 1346 (1978), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 871,

59 L.Ed.2d 55 (1979); *Smith v. Westland Life Ins. Co.*, 15 Cal.3d 111, 539 P.2d 433, 123 Cal. Rptr. 649 (1975); *Ransom v. Penn Mut. Life Ins. Co.*, 43 Cal.2d 420, 274 P.2d 633 (1954).

This rule is not so much based upon the intent of the agent and applicant to form a contract for temporary insurance as upon the belief of the applicant, reasonable under the circumstances in view of the ambiguous language in the application and an absence of any showing that the limiting condition was called to his attention, that he is insured for at least a temporary period when he has paid the initial premium.

*Maryland Casualty Co. v. Foster,* 76 N.M. 310, 414 P.2d 672 (1966); *Harden v. St. Paul Fire & Marine Ins. Co.,* 51 N.M. 55, 178 P.2d 578 (1947). Thus, in general, binders for temporary insurance may be made orally as well as in writing. Such a contract for temporary insurance remains in force according to the terms the parties have initially agreed upon, subject only to cancellation of the contract by the insurance carrier. *Cf. Smith v. Westland Life Ins. Co.,* 15 Cal.3d 111, 539 P.2d 433, 123 Cal.Rptr. 649 (1975) (where contract for temporary insurance arises due to acceptance of initial premium and issuance of conditional receipt, temporary insurance can be terminated only by notice of rejection and refund of the premium).

In NMSA 1978, Section 59A–18–22 (Repl.Pamp.1988), the Legislature has enacted regulations governing certain written and oral binders for temporary insurance. While this Section limits the validity of an oral binder to no longer than fifteen days from its effective date, NMSA 1978, Section 59A–18–22(B), the provisions of this Section expressly do not apply to a binder for life or health insurance. NMSA 1978, § 59A–18–22(D). Thus, a parol agreement for temporary life or health insurance is governed by common-law rules. Under the decisions of this Court, an oral contract for insurance is effected when the parties have agreed upon (1) the subject matter, (2) the risk to be insured against, (3) the duration of the risk, (4) the amount of insurance, (5) the rate of premium, and (6) the identity of the parties. *Maryland,* 76 N.M. at 312, 414 P.2d at 673.

An agent nonetheless may bind an insurer by oral agreement for insurance that is to be effective immediately only if such act is within either the actual or apparent authority of the agent. G. Couch, *Couch on Insurance 2d* § 14:33 (1984). Whether the agent has the authority to make parol contracts is a question for the jury when the facts are in dispute. *Id.* at § 26A:26. By "apparent authority of an agent," we mean such authority as a reasonably prudent person naturally would suppose the agent to possess in view of the insurer's conduct in clothing the agent with the trappings of actual authority. *See id.* at § 26:62; *Douglas v. Mutual Ben. Health & Accident Ass'n,* 42 N.M. 190, 195–97, 76 P.2d 453, 456–57 (1937); *see also Romero v. Mervyn's,* 109 N.M. 249, 784 P.2d 992 (1989) (issue concerning apparent authority of store manager to contract for medical expenses of injured customer). The power of an agent to bind the insurer is coextensive with this apparent authority. *Douglas,* 42 N.M. at 195–97, 76 P.2d at 456–57; *see also Huppert v. Wolford,* 91 Idaho 249, 420 P.2d 11 (1966); *Fanning v. Guardian Life Ins. Co. of Am.,* 59 Wash.2d 101, 366 P.2d 207 (1961); G. Couch, *Couch on Insurance 2d* § 26A:23 (1984).

From the affidavits of the former customers of N.N. Investors, a juror could infer that it was the company's practice to allow the agent to collect the initial premium at the time of the enrollment application. Where an insurance company has authorized the agent to accept payment, the agent may well appear to have the authority to effect immediate coverage. We believe a typical customer would have a reasonable belief that in return for a payment of cash, and an authorization for subsequent automatic payments, he has purchased some immediate benefit in return, especially where the consumer questions the agent and is assured that this is the case.

Of course, the language in the enrollment forms to the effect that insurance would not be effective until approved by the company is relevant evidence that it would not have been prudent for Streeter to suppose the agent had authority to effect immediate coverage. Likewise, there is language in the forms which Streeter signed to the effect that the agent did not have the authority to accept risks and the company was not bound by any statements of the agent. But in the absence of other evidence that conclusively establishes these provisions were specifically read to Streeter, and understood by him to preclude immediate coverage, we think an issue of whether the agent had apparent authority

to make an oral contract for temporary insurance is for the jury. Such a contract for temporary insurance may vary or even contradict the language of the written application signed by the applicant. With respect to the sale of insurance, the signing of a written application should not preclude evidence that the agreement of the parties is not integrated in such writing, but rather is the product of the representations of the agent that reasonably have been relied upon and accepted by the applicant. We specifically disapprove of any language to the contrary in *Fierro v. Foundation Reserve Insurance Co.*, 81 N.M. 225, 465 P.2d 282 (1970), and *State Farm Fire & Casualty Co. v. Price*, 101 N.M. 438, 684 P.2d 524 (Ct.App.), *cert. denied*, 101 N.M. 362, 683 P.2d 44 (1984). *Cf. Baker v. St. Paul Fire & Marine Ins. Co.*, 427 S.W.2d 281, 289 (Mo.Ct.App.1968) (material variance between the terms of an oral contract for insurance and policy as executed precludes merger of oral negotiations into written policy).

We have stated in other cases that an insured is only bound to make such examination of insurance documents as would be reasonable under the circumstances, and that this Court will not simply and mechanically charge the insured with the duty of reading and understanding insurance documents and then bar him from recovery by a literal application of the terms and provisions of those documents. *Pribble v. Aetna Life Ins. Co.*, 84 N.M. 211, 216, 501 P.2d 255, 260 (1972) (whether agent had actual or apparent authority to waive policy provision excluding coverage for occupational injuries was factual issue); *see also Romero v. Dairyland Ins. Co.*, 111 N.M. 154, 803 P.2d 243 (1990). Given the realities of the insurance business in which applications and certificates describe complex rights and obligations, it is to be expected that the average person will depend upon the agent to explain everything. This is the way people buy insurance in the real world. We point out that an insurance company may protect itself in large part from claims such as have been asserted in this case through the improved training and supervision of its agents. The agent,

of course, may be held responsible to the company for losses caused by unauthorized conduct.

 We also find that the court erred in granting summary judgment in favor of N.N. Investors concerning its assertion of material misrepresentations on Streeter's part. *See Prudential Ins. Co. of Am. v. Anaya*, 78 N.M. 101, 428 P.2d 640 (1967) (generally, insurer may rescind contract for insurance that would not have been issued but for applicant's misrepresentation). The affidavits before the court establish the existence of a question for the jury. We regard the evidence as susceptible to contrary inferences as to whether Streeter misrepresented his medical condition, *i.e.*, scoliosis, and much else of what the company says it later discovered. We first note that the answers in the questionnaire the agent filled out are internally inconsistent. N.N. Investors complains that Streeter answered "no" to questions 14(b) and 14(h). The agent nevertheless included a written explanation for the "no" answers to question 14. Explanations were required only for "yes" answers. Moreover, the fact of the 1980 spinal fusion was noted in the explanation for question 14. A reasonable inference from these facts is that the agent omitted the precise medical terminology which Streeter used to describe his congenital defect, or in some other fashion edited the information that Streeter provided him, contrary to the language in the forms that the answers on the application were "exactly those" related to the agent "with nothing left out."

Additionally, we believe Streeter's physical appearance is relevant to the question of whether his abnormality was disclosed. His condition was readily apparent. Various medical reports in the court record suggest that the curvature of his spine and deformity of his appearance was quite severe. The records indicate he wore a back brace and that he had a very short torso and neck, so much so that the base of his chin rested upon the front of his chest. Certainly the agent might have inferred a connection between Streeter's 1980 spinal fusion and this appearance. Even if we

assume, as the agent stated, that the agent did not question Streeter about his deformity out of a desire to avoid embarrassment, we do not think this reluctance should work to Streeter's disadvantage.

Moreover, when an applicant gives sufficient information to alert an insurance company to his particular medical condition or history, the company is bound to make such further inquiry as is reasonable under the circumstances in order to ascertain the facts surrounding the information given. Whether and to what extent the company should be charged with "inquiry notice" may well be issues of fact to be resolved by the jury in deciding if the applicant has misrepresented his condition in applying for insurance. Here, it was for the jury to find whether the information provided to the agent was sufficient to alert the company to Streeter's serious spinal condition. If the company was sufficiently alerted to the serious spinal condition, it either should have availed itself of the opportunity to review the records made available to it by the applicant, or be charged with notice of the information in those records.

We certainly cannot agree that the only use of medical records should be for the insurance company, once a claim has been filed, to sift through them for the purpose of claiming the applicant was somehow derelict in his duty to make a full disclosure at the time of his application for insurance. Streeter provided the name and telephone number of both his family physician and the surgeon who performed the 1980 spinal fusion. He signed a release authorizing N.N. Investors to obtain his medical records in the possession of these physicians. But the company made no effort to review those records prior to the filing of a claim for benefits. We cannot say that Streeter somehow misled the company as to the possible significance of the information in those records. His physical appearance and the notation regarding the 1980 spinal fusion indicate just the opposite.

■■■■■ Regardless of whether an insured is covered under a contract for temporary insurance or a permanent policy, where the jury finds that the insurer has been given sufficient information to alert it to a serious medical condition, and the insurer has failed to investigate the records of that condition made available by the applicant, we hold the insurer is charged with the information in those records. *See Reserve Life Ins. Co. v. McGee*, 444 So.2d 803, 816 (Miss.1983) (Robertson, J., specially concurring). If the insurer undertakes an investigation of disclosed medical records after issuing a binder for temporary insurance, any information in those records that might cause the insurer to reevaluate its position may form the basis of a right to cancel the policy, prior to the time an insured files a claim for benefits. However, we believe any risk should be shifted to the insurer with respect to any loss that arises in the interim.

■■■■■ Finally, N.N. Investors seems to equate Streeter's congenital defect, scoliosis, with pre-existing pulmonary disease. In this regard they claim that he failed to disclose: (1) a "restrictive pulmonary defect," (2) approximately a dozen incidents of hospitalization for treatment, (3) an incident of pulmonary compromise during the 1980 hospitalization for spinal fusion, and (4) treatment of pneumonia between 1961 and 1962. We think Ellingwood introduced sufficient evidence on each of these points to preclude summary judgment.

A pulmonary disease specialist stated that nothing in Streeter's medical history revealed a pre-existing pulmonary or respiratory condition. The expert stated that scoliosis may result in smaller lung capacity but this is not in itself pulmonary disease. The expert also stated that the incident of pulmonary compromise in 1980 was explained as an adverse reaction to a narcotic medication given Streeter after the operation to fuse his spinal column. The condition cleared up when the drug was discontinued.

Other affidavits showed the so-called hospitalizations for treatment of scoliosis were nothing more than a number of trips to the hospital for the adjustment of Streeter's back brace. Lastly, we agree with Ellingwood that little, if any, underwriting significance should be attributed to the fact that Streeter contracted pneumonia at about eighteen months of age. He suffered no further episodes until the time he died.

In addition to the claims against defendant N.N. Investors, the trial court granted summary judgment in favor of the company's agent. On appeal, Ellingwood contends the agent's representations of immediate coverage, as well as the agent's negligence in filling out the application forms, show the existence of issues of material fact concerning a claim for negligence against the agent and his principal. Ellingwood's complaint based its negligence claim against the agent and N.N. Investors on purported violations of NMSA 1978, Section 59A–16–20 (Repl.Pamp.1988) and NMSA 1978, Section 57–12–2(C) (Repl. Pamp.1987). The first statute prohibits unfair claims practices knowingly committed with such frequency as to indicate a general business practice. The second statute involves specific examples of unfair or deceptive trade practices prohibited under that Section. Ellingwood asserted that the purported violations in both cases constituted negligence per se. At the trial court level the parties' argument in support of and in opposition to the summary judgment motion was restricted to the issues concerning asserted misrepresentations by Streeter, whether he suffered from a pre-existing condition, and the effective date of insurance coverage. Likewise, the trial court in its judgment addressed only these issues. We deem the negligence claims remain before the court on remand.

For the above reasons, we reverse the entry of summary judgment entered on behalf of the defendants. We hold that genuine issues exist concerning whether the agent had the apparent authority to make a contract for temporary insurance and whether Streeter made material misrepresentations in his application.

The entry of summary judgment is reversed.

IT IS SO ORDERED.

SOSA, C.J., and MONTGOMERY, J., concur.