1997–NMCA–030

936 P.2d 872

**JOHNSON & JOHNSON and Affiliated Subsidiaries, Appellant,**

v.

**TAXATION AND REVENUE DEPART-MENT OF THE STATE OF NEW MEXICO, Appellee.**

**No. 17279.**

Court of Appeals of New Mexico.

March 7, 1997.

Certiorari Denied April 16, 1997.

Curtis W. Schwartz, Timothy C. Holm, Modrall, Sperling, Roehl, Harris & Sisk, P.A. Santa Fe, Paul H. Frankel, Morrison & Foerster, LLP, New York City, for Appellant.

Tom Udall, Attorney General, Bruce J. Fort, Special Ass't Attorney General, Taxation and Revenue Department, Santa Fe, for Appellee.

*OPINION*

PICKARD, Judge.

1. Johnson & Johnson (Taxpayer) entered into a compromise tax settlement agreement with the Taxation and Revenue Department (Department). The settlement agreement purported to settle all of Taxpayer's tax liability for all periods before 1991. We address three issues today: (1) whether we have jurisdiction over this appeal; (2) whether the signed settlement agreement between Taxpayer and the Department is conclusive on the parties as to all matters expressed therein even though the agreement did not receive attorney general approval as NMSA 1978, Section 7–1–20(A) (Repl. Pamp.1995) requires for compromising tax liability, and (3) if the agreement is not con-clusive by its terms, whether the doctrines of apparent authority or equitable estoppel require the Department to abide by the terms of the agreement. We hold that we have jurisdiction and that the requirements of Section 7–1–20(A), including written approval of the attorney general, must be met before a settlement agreement compromising tax liability is valid and enforceable. We also hold that the doctrine of apparent authority does not apply when the statute clearly negates such authority and that the doctrine of equitable estoppel does not apply in this case because right and justice do not demand its application.

*FACTS*

2. We state the facts briefly because the intricacies of tax law and practice are not important to the resolution of this case. Taxpayer is a multinational corporation and has two subsidiaries doing business in New Mexico. The Multistate Tax Commission is a commission formed pursuant to interstate compact, and it conducts audits on behalf of its member states. It conducted an audit on behalf of several states of Taxpayer's corporate income tax. The audit concluded in 1989. As part of the audit, the commission determined that several subsidiaries in addition to the two that were doing business in New Mexico had "nexus" with New Mexico. That nexus would increase Taxpayer's tax liability by some $40,000 for three years covered by the audit—1980–82. Taxpayer protested the assessment based on this audit; the only issue raised by the audit and assessment was that of nexus.

3. Although not raised by the audit, assessment, or negotiations related thereto, another issue was lurking behind the scenes concerning Taxpayer's tax liability in New Mexico at the time of the negotiations leading to the settlement agreement. This issue concerned the manner of Taxpayer's method of reporting its income and certain tax consequences related to its alleged unitary world-wide business and foreign source dividends. Ultimately, the Department assessed Taxpayer additional taxes, interest, and penalty based on these foreign source dividends in an amount of more than $2,000,000.

4. The final settlement agreement broadly purported to cover all issues and time periods before 1991. It provided:

This Agreement shall be final and conclusive for all periods prior to 1991, and these periods shall not be reopened by the Department, nor shall any suit, action or proceeding for determination, assessment, collection, refund or credit be brought by either party; provided, however, that adjustments to J & J's federal return by the Internal Revenue Service shall be subject to adjustment for New Mexico tax purposes. For the limited purpose of reflecting such limited adjustments only, J & J may file an amended return or the Department may issue an assessment.

5. Chiefly involved in negotiating and drafting the settlement agreement were Manny Gallegos, manager of the Department's protest office, and Joseph Robinson, Taxpayer's assistant director of domestic taxation. During the negotiations, the only issue Gallegos and Robinson discussed was the nexus issue. They never discussed the fact that Taxpayer had allocated all of its foreign source dividend income in such a manner as to exclude it from consideration by New Mexico in calculating Taxpayer's corporate income taxes.

6. Robinson knew at the time he was negotiating the settlement agreement that the Multistate Tax Commission had concluded that Taxpayer was a unitary business. Robinson also knew that New Mexico included foreign dividends from such businesses in a taxpayer's apportionable base in calculating income taxes. However, because the only years subject to the audit were 1980–82 and because Taxpayer did not change its method of reporting so that its liability for tax based on foreign source dividends was apparent until well after 1982, the issue of apportioning foreign source dividends was not brought up during the negotiations. Taxpayer and the Department decided to carry their agreement forward from the audited period to 1990 in order to close out the nexus issue until the time of the agreement.

7. Gallegos sent a draft agreement prepared by Taxpayer to Frank Katz, the Department's chief legal counsel, for review.

The draft appeared to close out all years through 1990. Katz responded to Gallegos with his concerns that the agreement could be construed to close all years through 1990. He testified that he did not want to close out all these years for all purposes, and the hearing officer found that Katz would not have approved a settlement agreement closing out all years prior to 1991 for all purposes. Gallegos misunderstood Katz's comment and suggested language to Taxpayer that explicitly closed all years before 1990. Gallegos assured Robinson that he would obtain all necessary approvals to make the settlement agreement binding. The Department secretary and its director of compliance were the only New Mexico officials to sign the agreement. Katz never reviewed the final agreement. If he had, he would not have approved it.

8. Perhaps because Gallegos left the Department, the settlement agreement was not sent to the attorney general for consideration until it was discovered in a file in 1994. The attorney general's office refused to approve the agreement because more than two years had passed since the Department had executed it and because the attorney who submitted it to the attorney general had not been involved in negotiating the agreement. The Department's practice required the attorney who was involved in drafting a settlement agreement to send it to the attorney general's office.

9. Then, in December of 1994, the Department reopened tax years 1987–90, claiming that Taxpayer had improperly allocated certain dividend income as non-business income. Faced with assessment of additional taxes based on its unitary worldwide business dividends, Taxpayer contended that the settlement agreement terms covered the years for which the Department was assessing taxes, and that the agreement bound the Department. The parties and the hearing officer decided to bifurcate the issues of: (1) whether the settlement agreement was binding and (2), if not, what Taxpayer's liability would be. The first matter went to a hearing, and the hearing officer ruled in favor of the Department. Taxpayer appeals, and be-

cause we agree with the hearing officer on all points, we affirm.

## DISCUSSION

### Jurisdiction

■ 10. While we fully agree with the dissent that a finality requirement would better serve both the administration of tax law and the administration of law in general, we believe that the language in *In re Application of Angel Fire Corp.*, 96 N.M. 651, 634 P.2d 202 (1981), controls this case. In particular, the Supreme Court there held that, where the statutory requirements do not expressly require finality in agency decisions, "there is no requirement of finality." *Id.* at 652, 634 P.2d at 203. We would urge the Supreme Court to remedy this matter, but until then we consider ourselves bound by the Supreme Court precedent. *See State v. Wilson*, 116 N.M. 793, 796, 867 P.2d 1175, 1178 (1994) ("[The Supreme] Court encourages the Court of Appeals to express its rationale for any reservations it might harbor over Supreme Court precedent. The Court of Appeals, nonetheless, remains bound by Supreme Court precedent[.]").

### Standard of Review

11. We review the decision of the hearing officer upon the record, and we will set aside the hearing officer's decision only if it is: (1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with the law. NMSA 1978, Section 7-1-25(C) (Repl.Pamp.1995); *see also Brim Healthcare, Inc. v. State ex rel. Taxation & Revenue Dep't*, 119 N.M. 818, 819, 896 P.2d 498, 499 (Ct.App.1995).

### Attorney General Approval

12. Taxpayer contends that the tax settlement is a valid and binding closing agreement within the meaning of Section 7-1-20 and that the hearing officer erred in concluding otherwise. Section 7-1-20 provides in relevant part:

A. At any time after the assessment of any tax, if the secretary in good faith is in doubt of the liability for the payment thereof, the secretary may, *with the written approval of the attorney general,* compromise the asserted liability for taxes by entering with the taxpayer into a written agreement that adequately protects the interests of the state.

B. The agreement provided for in this section is to be known as a "closing agreement." (Emphasis added.)

■ 13. Confronted with the clear requirement for written approval of the attorney general for such agreements to be valid, Taxpayer advances several reasons why the settlement agreement should nonetheless bind the Department. First, Taxpayer argues that statutes such as Section 7-1-20 are administrative in nature, and since they do not provide protection for individuals dealing with state agencies, they are less likely to be mandatory. Taxpayer cites as authority for this proposition *Anaconda Co. v. Department of Revenue*, 278 Or. 723, 565 P.2d 1084 (1977) (en banc). The court in that case said that procedures designed to protect individuals dealing with an agency are more likely to be mandatory than provisions, equally obligatory, which are designed to assure legally and fiscally correct public administration. *Id.* 565 P.2d at 1087. The court in *Anaconda* added, however, that the "text or background of a particular enactment may show otherwise" and that "the nature and extent of the disadvantage sought to be avoided by the procedure can bear on the probable intent with respect to noncompliance." *Id.*

14. Section 7-1-20 governs the procedure for compromising assessed tax liability. It requires written approval of the attorney general and that settlement agreements "adequately protect[ ] the interests of the state." Section 7-1-20(A). In light of this concern for protecting the interests of the state, namely the public fisc, we conclude that the statutory requirement is mandatory. The nature of the disadvantage here—possible loss to the state treasury and unfair distribution of the tax burden—counsels that compliance is mandatory.

15. Moreover, even if Taxpayer's assertion (that statutes not protecting individuals are less likely mandatory) is true as a general statement, this Court cannot ignore its duty to interpret the statute as written. *See*

*V.P. Clarence Co. v. Colgate*, 115 N.M. 471, 473, 853 P.2d 722, 724 (1993) (in interpreting and applying statutes, courts must determine and effectuate intent of legislature; clear statutory language must be given effect). Section 7–1–20 clearly requires written approval of the attorney general for the secretary of the Department to compromise asserted tax liability. Where a statute sets forth the procedures for contracting with the government, those procedures should be followed. *See Trujillo v. Gonzales*, 106 N.M. 620, 621–22, 747 P.2d 915, 916–17 (1987). This is particularly true where the statute contains the reasons for the procedures. Therefore, we conclude that tax settlement agreements without the required written approval are not valid or enforceable.

■ 16. In its second argument, Taxpayer calls to our attention a letter in which the attorney general's office advised the Department that "we would probably [have] approve[d] the agreement under § 7–1–20" had the agreement been timely submitted. Taxpayer argues that this letter constitutes the attorney general's ratification of the settlement agreement. "Ratification is the adoption or confirmation by a principal of an unauthorized act performed on its behalf by an agent." *Ulibarri Landscaping Material, Inc. v. Colony Materials, Inc.*, 97 N.M. 266, 270, 639 P.2d 75, 79 (Ct.App.1981), *cert. denied*, 98 N.M. 50, 644 P.2d 1039 (1982). The statement in the letter from the attorney general's office in no way constitutes a ratification. By saying "we probably would approve the agreement" under other circumstances, the attorney general's office specifically showed that it had not approved the agreement under these circumstances. Taxpayer's argument that the attorney general ratified the agreement fails.

■ 17. Taxpayer also argues on appeal that the settlement agreement compromised an asserted tax liability for 1980–82 but not an asserted liability for tax years 1987–90. Taxpayer alleges that the Department simply agreed to accept the returns as filed for 1987–90, and accordingly the provisions of the agreement relating to 1987–90 do not need written attorney general approval to bind the Department. This position is contrary to Taxpayer's position below. There Taxpayer argued that the settlement agreement was a single, indivisible agreement for which adequate consideration was given.

18. Section 7–1–25(A) provides in part:

A. If the protestant or secretary is dissatisfied with the decision and order of the hearing officer, the party may appeal to the court of appeals for further relief, but only to the same extent and upon the same theory as was asserted in the hearing before the hearing officer.

Taxpayer now argues that the settlement agreement binds the Department on a theory contrary to which Taxpayer argued below. We therefore decline to address the merits of the argument.

19. We hold that the settlement agreement compromising tax liability is not valid or enforceable because it lacks the attorney general's written approval as Section 7–1–20 requires. The hearing officer's decision was in accordance with the law and supported by substantial evidence. We next address the issues of apparent authority and equitable estoppel.

*Apparent Authority*

■ 20. Taxpayer argues that even if the secretary lacked actual authority to enter into the settlement agreement, the agreement is binding because the Department employees who executed it had apparent authority to enter into such agreements. Apparent authority of an agent is such authority as a reasonably prudent person naturally would suppose the agent to possess in view of the principal's conduct in clothing the agent with the trappings of actual authority. *See Ellingwood v. N.N. Investors Life Ins. Co.*, 111 N.M. 301, 306, 805 P.2d 70, 75 (1991).

21. Taxpayer has put forth no evidence to show that the secretary of the Department, the Department's director of compliance, or Manny Gallegos were agents of the attorney general. Taxpayer has also failed to show how the attorney general clothed the secretary or Gallegos with authority to approve agreements for which statute requires attorney general approval.

22. The hearing officer concluded that the attorney general's office and the Department were separate agencies with no agency relationship or delegation of authority. He also concluded that Taxpayer had constructive knowledge of the requirements of Section 7–1–20 and could not have reasonably relied upon the settlement agreement as binding without the attorney general's written approval. This reasoning is sound. Since Section 7–1–20 requires written approval of the attorney general for settlement agreements, there could be no clothing of the secretary or of Gallegos with authority to enter into the settlement agreement. The statute, in fact, negates any such authority.

23. Taxpayer argues also that the hearing officer erred in finding that the attorney general's office and the Department are separate agencies. Taxpayer argues that the Department can therefore act with apparent authority from the attorney general to compromise taxes through settlement agreements. In support of this assertion, Taxpayer calls our attention to the fact that chief counsel Katz and other attorneys for the Department are special assistant attorneys general. NMSA 1978, Section 8–5–5(A) (Repl.Pamp.1994) states that assistant attorneys general "shall, subject to the direction of the attorney general, have the same power and authority as the attorney general."

24. Even assuming for argument that special assistant attorneys general are the same as assistant attorneys general and that Section 8–5–5 creates apparent authority, Taxpayer's argument has a fatal flaw. That flaw is that no assistant attorney general, special or otherwise, approved the settlement agreement. Katz himself disapproved of the first draft of the settlement agreement, and he would not have approved the final settlement agreement had he seen it.

25. Taxpayer asserts in its brief in chief that Katz "advised that the approval of the [a]ttorney [g]eneral was not needed for the agreement[.]" This is inaccurate. Katz testified that the attorney general's office had authorized him, as a special assistant attorney general, to sign off on refunds. But Katz also testified that "it was very clear" that the attorney general's office did not extend to any special assistant attorneys general in the Department any authority to sign off on closing agreements.

26. We conclude that there was substantial evidence upon which the hearing officer could find that the attorney general's office and the Department were separate agencies. There was also substantial evidence for the hearing officer to find that there was no closing by the attorney general of the Department with apparent authority. His decision on these points was also in accordance with law since no statute created apparent authority, and Section 7–1–20 appears to negate such authority.

*Equitable Estoppel*

27. Taxpayer argues last that the doctrine of equitable estoppel precludes the Department from disavowing the settlement agreement. Estoppel against the State is very limited. It generally applies only pursuant to statute or when right and justice so require. *Taxation & Revenue Dep't v. Bien Mur Indian Mkt. Ctr., Inc.*, 108 N.M. 228, 230, 770 P.2d 873, 875 (1989). NMSA 1978, Section 7–1–60 (Repl.Pamp.1995) provides for estoppel against the Department in two circumstances: where the taxpayer acted according to a revenue ruling addressed to the taxpayer or where the taxpayer acted according to a regulation. Neither of these circumstances is Taxpayer's in the present case, and Taxpayer has not argued that either applies.

28. Case law provides for estoppel against the State where right and justice demand its application. *Bien Mur Indian Mkt. Ctr., Inc.*, 108 N.M. at 230, 770 P.2d at 875. For estoppel to apply, the party seeking it must show: (1) lack of knowledge of the true facts in question; (2) detrimental reliance on the other party's conduct; and (3) that its own reliance was reasonable. *Gonzales v. Public Employees Retirement Bd.*, 114 N.M. 420, 427, 839 P.2d 630, 637 (Ct. App.), *cert. denied*, 114 N.M. 227, 836 P.2d 1248 (1992).

29. In this case, the hearing officer could properly find that Taxpayer knew or should have known the true facts about what it

agreed to in the settlement agreement. If anything, Taxpayer had more knowledge than the Department did regarding Taxpayer's other potential tax liability from the foreign source dividends. If Joseph Robinson, Taxpayer's assistant director of domestic taxation, had thought about it, he would have known during the negotiations with the Department that Taxpayer's tax liability in New Mexico potentially involved more than the nexus issue. He knew that the Multistate Tax Commission had concluded that Taxpayer was a unitary business, and that New Mexico included foreign dividends from such businesses in a taxpayer's apportionable base for calculating income taxes once Taxpayer changed its reporting method after 1982. To say that Taxpayer did not know the true facts in question at the time of the negotiations stretches too far.

30. There is also no showing that Taxpayer suffered a detriment from any reliance on the validity of the settlement agreement. Taxpayer alleges as detriment that, in reliance on the validity of the agreement, it: (1) made no further efforts to settle with the Department; (2) did nothing further with the closed tax years; (3) is now being forced to contest arbitrary additional taxes, penalties, and interest as to the years it relied on as being closed; and (4) has had to incur substantial expenses litigating over the purportedly closed tax years.

31. We note that Taxpayer does not specifically argue that the foreign source dividend liability now asserted by the Department is itself a detriment. As a result, Taxpayer's failure to make further efforts to settle and to do anything further with the closed tax years has no connection to any detriment we can perceive, and Taxpayer alleges none. Furthermore, there is no indication as to who or what has "forced" Taxpayer to contest additional taxes, penalties, and interest. That decision rests with the Taxpayer alone, as does the decision to incur expenses litigating the agreement. Taxpayer has alleged no detriment that resulted from reliance on the validity of the agreement. Taxpayer has simply alleged by-products of its dissatisfaction with the

Department's decision to reopen the tax years the agreement purported to close.

32. Equitable estoppel also requires that the reliance of the party seeking to assert the doctrine be reasonable. *Bien Mur Indian Mkt. Ctr., Inc.*, 108 N.M. at 231, 770 P.2d at 876. Two facts present here militate against the reasonableness of any reliance by Taxpayer on the settlement agreement or on Gallegos's representations that he would get the necessary approvals. First, Gallegos and Robinson negotiated the settlement agreement in the context of the nexus issue, which involved approximately $40,000. It is unreasonable to think that the Department would settle for only $40,000 the foreign source dividends issue, for which it could later assert a liability of more than $2,000,000. Furthermore, Gallegos's statement indicated that he would get the approvals, not that he had already obtained them. This statement shows that the agreement was contingent upon getting the approvals. *See Rainaldi v. Public Employees Retirement Bd.*, 115 N.M. 650, 659, 857 P.2d 761, 770 (1993) (reliance unreasonable where approval of retirement contingent upon legal documentation from attorney general).

33. The second fact is Section 7–1–20. It is difficult to imagine that Taxpayer, a sophisticated, multinational corporation with its own domestic taxation office, would not be aware of the statutory requirement for written attorney general approval of closing agreements. *Cf. Bien Mur Indian Mkt. Ctr., Inc.*, 108 N.M. at 231, 770 P.2d at 876 (in light of statute providing for estoppel, taxpayer did not act reasonably in relying on oral representations of Department).

34. Taxpayer calls our attention to *Pennsylvania Department of Revenue v. King Crown Corp.*, 52 Pa.Cmwlth. 156, 415 A.2d 927 (1980), as an example where estoppel applied against the state. There an assistant attorney general of the Commonwealth of Pennsylvania sent a letter to the taxpayer saying that the Commonwealth had accepted the taxpayer's settlement proposal. *Id.* 415 A.2d at 928. Pennsylvania statutory law required approval from the Chief of the Commonwealth Collections Division, which was not obtained. *Id.* at 929. The Common-

wealth Court of Pennsylvania decided the case on the basis of the reasonableness of the taxpayer's belief that a settlement had been agreed upon. *Id.* at 930. The court also found that the regulation requiring approval did not preclude a further delegation of authority to communicate the Commonwealth's decision to settle claims. The taxpayer's reliance there was thus reasonable and the Commonwealth was estopped. *Id.*

35. In the present case, we have already determined that Section 7–1–20 requires written approval of the attorney general. That statute makes no provision for delegating that authority to the Department, and clearly precludes it by requiring attorney general approval of the Department's settlement agreements. Furthermore, no such approval ever issued, nor did anyone in the Department communicate such approval. Gallegos's representation that he would obtain the necessary approvals is not a communication of them. On the contrary, his statement shows that the agreement was still contingent upon securing the approvals.

36. We note that this is not a case that turns on a breach of promise to get approvals. Even if Gallegos had kept his promise, the settlement agreement would have been disapproved, albeit much sooner. As we noted above, Katz would have disapproved the settlement agreement had he seen the final version. Since Katz reviewed the first draft, he would likely have been the attorney responsible for forwarding the final draft to the attorney general, in keeping with Department practices. His disapproval, however, would have kept the settlement agreement from ever making it to the attorney general for consideration. Thus, Gallegos's failure to obtain the approvals did not affect the ultimate result for Taxpayer, only the timing of it.

37. Because Section 7–1–20 precludes delegation of authority to the Department to approve settlement agreements, and since there was no communication here that the necessary approvals had been obtained, *King Crown Corp.* is distinguishable. We conclude that its reasoning does not apply here.

38. Since Taxpayer has raised the issue of equity, we also note that Taxpayer now wants the settlement agreement to have an effect Taxpayer never explicitly intended—to foreclose more than $2,000,000 in corporate tax liability for foreign source dividends under an agreement intended by everyone involved to only settle $40,000 in nexus tax liability. On the other hand, if Taxpayer did intend such a result at the time while knowing of the Department's belief that only nexus liability was at issue, its actions might border on fraud. We therefore hold that right and justice do not demand the application of equitable estoppel against the Department.

## CONCLUSION

39. We affirm the decision of the hearing officer on all points.

40. **IT IS SO ORDERED.**

BUSTAMANTE, J., concurs.

HARTZ, C.J., Dissents.

HARTZ, Chief Judge (dissenting).

(41) I express no view on the substantive law set forth in the majority's opinion. I think it inappropriate to address those issues because this Court has no jurisdiction to hear the appeal. As explained below, the right to appeal from decisions of a hearing officer for the Taxation and Revenue Department is limited to final orders that resolve how much, if any, tax is owed by the taxpayer. No final order has been entered by the hearing officer in this case.

(42) The matter before the hearing officer was Taxpayer's administrative protest to the Department's estimated provisional assessment of income tax, penalty, and interest for several tax years. The parties and the hearing officer agreed to bifurcate the hearing. First, the hearing officer would determine whether the 1992 settlement agreement was enforceable. If it was not enforceable, the hearing officer would then conduct a second proceeding to calculate the amount owed. Although the hearing officer ruled that the settlement agreement was unenforceable, the second proceeding has not been conducted.

(43) Had the proceeding before the hearing officer been a judicial proceeding in dis-

trict court, Taxpayer would have had no right to appeal prior to a ruling on the amount owed. Under what is known as the final-order rule, for a district court decision to be appealable as of right, it must be a *final* order or decision, meaning that it disposes fully of the case pending before the district court. *See* NMSA 1978, § 39–3–2 (Repl. Pamp.1991); *Kelly Inn No. 102 v. Kapnison,* 113 N.M. 231, 236, 824 P.2d 1033, 1038 (1992).

(44) There are sound reasons to grant the right to appeal only to final orders and decisions. The final-order rule promotes overall efficiency in the judicial system. It prevents delay caused by piecemeal appeals and avoids appellate review of issues that may be mooted by later events. This case is an object lesson. A little less than a year after the hearing officer ruled that the settlement agreement was invalid, this Court rules that he was correct. Even if there is no motion for rehearing or petition for a writ of certiorari, the interruption in the proceedings before the hearing officer will be well over a year. What can be expected after the matter is returned to the hearing officer? The hearing officer may issue an opinion that is appealed by either Taxpayer or the Department. In that event, the parties will have experienced the delay and added expense of piecemeal appeals. Or the hearing officer's final decision may be sufficiently tolerable to both parties that there is no appeal. Indeed, the result may be so satisfactory to Taxpayer that it would not want to appeal even if it could still pursue its settlement-agreement argument on appeal. In that event, this appeal was unnecessary.

(45) To be sure, occasionally the judicial process is expedited by an appeal from a non-final order. For example, if this Court had ruled in favor of Taxpayer with respect to the settlement agreement, the case would be resolved and both the parties and the hearing officer would be spared the need to litigate the amount owed. But experience, such as our experience in this case, demonstrates that the advantages of the final-order rule far outweigh its disadvantages. *See Baca v. Atchison, Topeka & Santa Fe Ry. Corp.,* 121 N.M. 734, 918 P.2d 13 (Ct.App.),

*cert. quashed,* 121 N.M. 783, 918 P.2d 369 (1996). (And the disadvantages could be reduced substantially if the legislature were to enact a statute granting the appellate court discretion to hear interlocutory appeals from administrative tribunals when the tribunal and the court believe that appellate resolution of the interlocutory order will expedite the litigation. *See* NMSA 1978, § 39–3–4 (Repl.Pamp.1991) (governing interlocutory appeals from lower courts); Rule 12–203 NMRA 1997 (same); *cf. Sanchez v. Bradbury & Stamm Constr.,* 109 N.M. 47, 781 P.2d 319 (Ct.App.1989) (no statutory authority for interlocutory appeals in workers' compensation cases).)

(46) Regardless of the merits of the final-order rule, however, perhaps the New Mexico legislature has not imposed the rule on appeals from the Department to this Court. In a memorandum filed while this appeal was pending on our summary calendar, *see* Rule 12–210(D) NMRA 1997 (rule describing summary calendar), Taxpayer pointed out that the applicable statute makes no mention of finality. NMSA 1978, § 7–1–25(A) (Repl. Pamp.1995), states:

> If the protestant or secretary is dissatisfied with the decision and order of the hearing officer, the party may appeal to the court of appeals for further relief, but only to the same extent and upon the same theory as was asserted in the hearing before the hearing officer.... All such appeals to the court of appeals shall be taken within thirty days of the date of mailing or delivery of the written decision and order of the hearing officer to the protestant, and, if not so taken, the decision and order are conclusive.

(47) Nevertheless, I would hold that finality is required. Federal law is instructive. Before Congress enacted the Administrative Procedure Act (APA) fifty years ago, the self-imposed policy of the courts was to limit judicial review to final orders. *See Carter/Mondale Presidential Comm. v. Federal Election Comm'n,* 711 F.2d 279, 285 n. 9 (D.C.Cir.1983) (quoting Final Report of the Attorney General's Committee on Administrative Procedure, *Administrative Procedure in Government Agencies,* S. Doc. No. 8, 77th

Cong., 1st Sess. 85 (1941)). The United States Supreme Court continues to adopt that approach. In *Bell v. New Jersey*, 461 U.S. 773, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983), the appeal was pursuant to either 20 U.S.C. Section 2851 or 20 U.S.C. Section 1234d. The unanimous Court wrote:

> The first provision permits judicial review in the courts of appeals of the Secretary's final action with respect to audits, and the second permits judicial review in the courts of appeals of actions of the Board. Although only [Section 2851] explicitly requires "final" action, we think that a final order is necessary under either section. *The strong presumption is that judicial review will be available only when agency action becomes final,* and there is nothing in [Section 1234d] to overcome that presumption.

*Id.* at 777–78, 103 S.Ct. at 2190–91 (emphasis added) (citations omitted); *see generally* 16 Charles Alan Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure* § 3942 (1996).

(48) Taxpayer's memorandum points to more recent language by the Supreme Court that could be interpreted as saying that finality is required only when the governing statute expressly so provides. In *Lujan v. National Wildlife Federation*, 497 U.S. 871, 882, 110 S.Ct. 3177, 3185, 111 L.Ed.2d 695 (1990), the majority said:

> When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the "agency action" in question must be "final agency action." See 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.").

One might infer that the APA does not impose the final-order rule on appeals from "[a]gency action made reviewable by statute." 5 U.S.C. § 704. But *Lujan* had no occasion to address whether to continue to recognize a "strong presumption" of finality. It would be remarkable if the above-quoted single sentence in *Lujan* were intended to overturn the longstanding doctrine unani-

mously followed in *Bell* just seven years earlier. On the contrary, I would expect the Supreme Court to agree with the scholarly and thoughtful opinion of Judge Wald in *Carter/Mondale Presidential Committee*, which noted that "courts commonly impose a finality requirement where statutes simply provide for judicial review of agency actions" and that "[n]othing in the legislative history of the APA suggests that a statute that simply states ... that any agency action is reviewable, has displaced the finality test." 711 F.2d at 285 n. 9. The opinion concluded that Congress "assumed that '[a]gency action made reviewable by statute' would be final action." *Id.* at 284 n. 9 (quoting the APA, 5 U.S.C. § 704.)

(49) Of course, federal law can only be persuasive. New Mexico may follow a different course. The majority's opinion, relying on *In re Application of Angel Fire Corp.*, 96 N.M. 651, 634 P.2d 202 (1981), believes that to be the case. In *Angel Fire* our Supreme Court held that an appeal from the state engineer to the district court had not been timely. The state engineer had issued an order on September 22, 1980 and then filed a modified order on October 28 after one of the parties had petitioned for modification on October 1. The party challenging the state engineer did not accomplish all the steps necessary for perfecting an appeal until October 30. The Court ruled that the challenger was too late to appeal the September 22 order. Its complete explanation was as follows:

> The statutory requirements are clear. "[A]ny decision, act or refusal to act of the state engineer" may be appealed. § 72-7-1. Thus, there is no requirement of finality. In the posture of the present case, [the challenger] is therefore required to appeal separately from the September 22 order and the October 28 modification order if it contests each.

*Id.* at 652–53, 634 P.2d at 203–04. Nevertheless, in the absence of any citation to authority by *Angel Fire* or any discussion in the opinion of why New Mexico would reject the traditional strong presumption in favor of the final-order rule, I am reluctant to read more

into *Angel Fire* than is required by the precise holding of the case.

(50) Supporting this view is a more recent statement from the New Mexico Supreme Court. In *New Mexico Industrial Energy Consumers v. New Mexico Public Service Comm'n*, 111 N.M. 622, 629, 808 P.2d 592, 599 (1991), the Court wrote: " '[A]n appellate court will not review the proceedings of an administrative agency until the agency has taken final action.' *Harris v. Revenue Div. of Taxation & Rev. Dep't*, 105 N.M. 721, 722, 737 P.2d 80, 81 (Ct.App.1987)." [1] The citation to *Harris* is particularly significant because in *Harris* this Court was interpreting the predecessor to the statute at issue on this appeal. The predecessor statute also contained no explicit finality requirement. The principal difference between that statute and the present one is that the predecessor statute provided for appeal from the decision rendered by the director of the Department, whereas the present statute provides for appeal from the decision rendered by the hearing officer. [2]

(51) Moreover, even in the absence of a presumption in favor of a finality requirement, the language of the statutes governing this case suggests such a requirement. The proceeding before the hearing officer was pursuant to NMSA 1978, Section 7–1–24 (Repl.Pamp.1995), which governs taxpayer protests to assessments by the Department. The statute requires the hearing officer to issue a written decision after the hearing. Section 7–1–24(H). "The written decision shall embody an order granting or denying the relief requested or granting such part thereof as seems appropriate." *Id.* The statute governing appeals, § 7–1–25(A), then states: "If the protestant or secretary is dissatisfied with the decision and order of the hearing officer, the party may appeal to the court of appeals for further relief." The statute refers to *the* decision *and* order, rath-

er than *a* decision *or* order. The natural inference is that Section 7–1–25(A) is referring to the single, ultimate decision and order arising out of the proceedings before the hearing officer—that is, the written decision and order that grants or denies in whole or in part the relief requested, *see* § 7–1–24(H). The ruling appealed here did not dispose of the matter and thus did not constitute "*the* decision and order of the hearing officer."

(52) For the foregoing reasons, I respectfully dissent from the majority's holding that we have jurisdiction to hear Taxpayer's appeal.

---

1. The opinion in *New Mexico Industrial Energy Consumers* dealt only briefly with the question of finality. The principal issue was ripeness, which is not a concern on this appeal.

2. The predecessor statute, NMSA 1978, Section 7–1–25(A) (Repl.Pamp.1983), stated:

    A. If the protestant or claimant is dissatisfied with the action and order of the director

after a hearing, he may appeal to the court of appeals for further relief, but only to the same extent and upon the same theory as was asserted in the hearing before the director.... All such appeals ... shall be taken within thirty days of the date of mailing or delivery of the written decision and order of the director to the protestant or claimant.